BELOIT CULLIGAN SOFT WATER SERVICE, INC., a Wisconsin Corporation; Adolph H. Samuels, dba Culligan Soft Water Service; Merrill R. Fie, dba Culligan Soft Water Service of Denver; John J. Burnham and Irene Burnham, a partnership, dba Culligan Soft Water Service Co. of Ogden, Utah; James W. Fisher and John W. Fisher, dba Culligan Soft Water Service, Santa Rosa, California; L. A. McRae, dba Culligan Soft Water Service of Palo Alto, California and George W. Geiger, dba Culligan Soft Water Service of San Bruno, Plaintiffs-Appellees,

v.

CULLIGAN, INC., a Delaware corporation, Defendant-Appellant.

No. 12613.

United States Court of Appeals
Seventh Circuit.

Dec. 15, 1959.

Rehearing Denied Jan. 12, 1960.

Robert A. Sprecher, B. L. Pollak, Frank A. Karaba, Gerald White, Chicago, Ill., for defendant-appellant.

David R. Macdonald, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., for plaintiffs-appellees, E. Houston Harsha, Chicago, Ill., of counsel.

Before HASTINGS, Chief Judge, and DUFFY and SCHNACKENBERG, Circuit Judges.

DUFFY, Circuit Judge.

This is a suit for a declaratory judgment to require defendant, Culligan, Inc.,

(hereinafter called "Culligan") to recognize the validity of certain dealership franchise agreements entered into between Culligan and the respective plaintiffs.

In the period 1945 to 1947, five of the plaintiffs entered into franchise agreements with Culligan, which were substantially identical except for names, territory, termination date and number of service units to be purchased. These contracts are known as "First Post War Contracts." The respective expiration dates are: December 4 and December 21, 1960; November 20, 1970; June 25, 1972 and October 1, 1972.

In 1954 and 1956, respectively, the other two plaintiffs entered into franchise agreements with Culligan which were substantially identical with each other except as to items similar to those noted in the preceding paragraph. These contracts are known as "Second Buff Contracts." The expiration dates are June 1, 1964 and January 26, 1966.

Each of the First Post War Contracts contained an undertaking by Culligan to sell, and by the respective plaintiffs to purchase, all of the plaintiff's requirements of water softening units, equipment, parts and materials. In the Second Buff Contracts there was the undertaking by the dealers to purchase specified equipment and materials including Culligan's water conditioning minerals and service tanks and other parts, although equipment and material not specified could be purchased from other dealers.

In each of the First Post War Contracts, the dealer undertook "to use his best endeavors in the sale and promotion" of water conditioning services and Culligan's products. In the Second Buff Contracts, the dealer promised "to diligently and loyally promote and foster" the increase of the use and acceptance of Culligan soft water service.

In both types of contract, the dealer agreed that he would provide capital to establish offices, sales rooms and service plants acceptable to Culligan, and that he would maintain sufficient stock and equipment, and would maintain in serviceable and clean condition all service units in accordance with Culligan standards. He also agreed to cooperate with Culligan in formulating sales promotion plans.

In the First Post War Contracts, Culligan granted to each plaintiff a designated territory within which each plaintiff had the exclusive right to distribute Culligan's water conditioning products. In the Second Buff Agreements each plaintiff was given the right to operate exclusively in a designated territory under the Culligan plan which is a comprehensive soft water service plan.

Both types of contract contained severability clauses. The First Post War Agreement contained the following: "If any provision of this agreement is held to be invalid or unenforcible, this contract shall, as to such provisions, be considered divisible, and the balance of the agreement shall be valid and binding." The Second Buff Agreement provides: "Any provision of this Agreement prohibited by law shall be ineffective to the extent of such prohibition without in any way invalidating or affecting the remaining provisions of this Agreement."

Each plaintiff expended substantial sums of money in developing territories granted to him or it by Culligan. Extensive advertising was undertaken, through media such as newspapers, billboards, radio and television. This advertising was done under the name of "Culligan Soft Water Service," and often the names of the dealers were not mentioned.

On October 31, 1956, the Federal Trade Commission filed a complaint against Culligan charging a violation of Section 3 of the Clayton Act (15 U.S. C.A. § 14), by requiring its dealers not to purchase or deal in water softening products made by competitors of Culligan. Later, Culligan agreed to a consent order which became effective May 23, 1957. Culligan agreed to desist from making any contract or continuing in effect any existing contract for the sale of its products on condition the purchas-

er shall not use, deal in, or sell similar or related products supplied by any competitor.

The order also provided: "* * * nothing in this order shall prohibit respondent from entering into an agreement with its dealers prohibiting them from using or selling for use, in the Culligan plan, parts, equipment or material which would adversely affect respondent's water conditioning service unit."

By letter of July 9, 1957, Culligan notified its dealers including plaintiffs, that the consent order "* * * by its nature invalidated all Culligan franchises." Later, Culligan submitted a new form of franchise agreement to its dealers, including plaintiffs, which terminated any pre-existing franchise, and granted the dealer a non-exclusive territory. Fifty-seven dealers, including plaintiffs, declined to execute the new agreement, although a large majority did so. By letter of December 29, 1958, Culligan wrote to each plaintiff purporting to cancel plaintiff's existing franchise agreement on the sole ground that plaintiff had failed to execute the new form of franchise. Culligan informed plaintiffs it would no longer sell its product to them, and demanded they discontinue the use of the name "Culligan" in their business. There was no claim that any plaintiff had breached his or its franchise agreement.

Culligan argues that the contracts sought to be enforced are invalid and unenforceable because they contain provisions which are in violation of section 3 of the Clayton Act. Defendant insists the illegal provisions invalidate the entire contract. The District Court held otherwise, and entered a declaratory judgment in favor of plaintiffs. The Court also issued an injunction restraining Culligan from interfering with the rights of plaintiffs in their franchise agreements.

The District Court concluded that the consent order effective May 23, 1957 did not affect the rights of plaintiffs under their franchise agreements and did not excuse Culligan from performing its contractual obligations under such agreements. The Court was of the view that the severability clauses were valid and effective, and that the agreements were valid in all respects other than the requirements clause.

Section 3 of the Clayton Act, 15 U.S.C.A. § 14, provides, in part:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to * * * make a * * * contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, * * * on the condition, agreement, or understanding that the * * * purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor * * * of the * * * seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

In arguing that the respective franchise agreements are unenforceable, Culligan has cited a number of court decisions where price-fixing provisions of contracts have been considered. In United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, the Court held price-fixing agreements to be in violation of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note and to be illegal *per se*. In United States v. Line Material Co., 333 U.S. 287, at page 307, 68 S.Ct. 550, at page 560, 92 L.Ed. 701, the Court said: "In the absence of patent or other statutory authorization, a contract to fix or maintain prices in interstate commerce has long been recognized as illegal *per se* under the Sherman Act." In that case the Court also stated, 333 U.S. at page 308, 68 S.Ct. at page 561: "It is equally well settled that the possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent monopoly." At a later date the Court held illegal an agreement to hold down prices by limiting

maximum prices. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219. Again, in United States v. McKesson & Robbins, Inc., 351 U.S. 305, 309, 310, 76 S.Ct. 937, 100 L.Ed. 1209, the Court emphasized that price fixing is conclusively presumed to be unreasonable.

The Supreme Court has adopted a different approach in considering exclusive dealing provisions or requirement contracts which are prohibited by Section 3 of the Clayton Act. The Court has emphasized the importance of the part of that statute which provides exclusive dealing agreements are illegal "where the effect of such * * * contract * * * may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C.A. § 14.

In the earlier cases, the Court applied the "Rule of Reason" of the Sherman Act,[1] to Section 3 of the Clayton Act.[2] However, in International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, the Court moved away from the "Rule of Reason" in determining the legality of exclusive dealing provisions. Any lurking suspicion that the "Rule of Reason" was applicable to Section 3 Clayton Act violations was dispelled by the decision in Standard Oil Co. of California and Standard Stations, Inc. v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. The Court stated, 337 U.S. at page 314, 69 S.Ct. at page 1062: "We conclude, therefore, that the qualifying clause of § 3 is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected."

█ It is clear that there is a substantial distinction between the standard to be used in determining the illegality of a price-fixing provision and the standard to be used in passing on the claimed illegality of an exclusive dealing provision. Absent a patent or fair trade agreement, a price-fixing agreement is *per se* illegal. There is no necessity to go outside the contract containing such provision. It is presumptively illegal regardless of the position of the parties in the appropriate market.

█ Exclusive dealing provisions, on the other hand, are not in and of themselves illegal. It must be determined whether or not the volume of business affected is "insignificant or insubstantial." International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20. Thus, an exclusive dealing provision might be legal at the time the contract was executed, but due to the growth of the business of the parties and the volume of the business they affect, the provision might become illegal. Also, it was pointed out in the Standard Stations case, 337 U.S. 306, 69 S.Ct. 1058: "Requirements contracts, on the other hand, may well be of economic advantage to buyers as well as to sellers, and thus indirectly of advantage to the consuming public."

The case of Kelly v. Kosuga, 1959, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475, is enlightening and is the most recent expression we have from the Supreme Court bearing upon the issues we are here considering. In Kelly, plaintiff and his associate, in 1955, had 1000 cars of onions which they could not dispose of through regular channels. They met with a group of mid-western onion growers, and threatened to deliver their onions on the futures exchange which would have resulted in depressed prices. Defendant, a grower, agreed to buy 287 of the 600 cars of onions which plaintiff had stored in the Chicago area. In consideration thereof, plaintiff and his associate agreed not to deliver onions on the futures market for the balance of the current trading season. Defendant and other buyers also agreed not to deliver any of the purchased onions on the futures market during that season. These

---

1. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619.

2. Standard Fashion Company v. Magrane-Houston Co., 258 U.S. 346, 355, 42 S. Ct. 360, 66 L.Ed. 653.

facts were pleaded as a defense to an action for payment of the price of 50 cars of onions.

▆ In upholding the right of the plaintiff to recover, the Supreme Court recognized the validity of the defense offered but only in a very limited situation where the judgment of the court would be the vehicle by which the unlawful conduct is carried out. In a paper "Recent Antitrust Developments," [3] Professor Milton Handler, in commenting on the Kelly case, said: "Presumably, unless the Court becomes an accessory after the fact by enforcing the precise conduct made unlawful by the statute, the agreement between the parties will be upheld and payment of the purchase price ordered." We agree with this conclusion.

We interpret the current view of the Supreme Court to be that a defense based on violation of Section 3 of the Clayton Act is valid if the contract at issue is intrinsically illegal; that is—if the Court, by its judgment, would be enforcing the specific conduct prohibited by the Act. But such is not the case in the franchise agreements we are considering in the case at bar. We note again that all exclusive dealing contracts are not violative of Section 3 of the Clayton Act. Furthermore, plaintiffs are not asking the Court to enforce the exclusive dealing provision of the agreements. As stated in Kelly v. Kosuga, supra, 358 U.S. at page 521, 79 S.Ct. at page 432, the contract need not be condemned " * * * though it furnished the occasion for a restrictive agreement of the sort here in question."

▆ Culligan strongly argues that to sever the requirement provisions from the franchise agreements would, in each case, leave a void instrument totally lacking in mutuality and failing in consideration. Culligan also insists that plaintiffs are in pari delicto.

Relying upon their franchises, the plaintiffs invested large sums of money in their businesses which were conducted under the Culligan name. In the early years of operation they uniformly operated at a loss. Several of the plaintiffs have commitments to advertise Culligan products for considerable periods in the future. The years of effort and expenditure of funds by plaintiffs have borne fruit, and in recent years, the plaintiffs usually have been operating at a profit. Their businesses under the Culligan name have become well established. Such good faith conduct by plaintiffs might, in itself, be grounds for holding there was no lack of mutuality in the contracts we are considering. Molitor v. Chicago Title & Trust Co., 325 Ill.App. 124, 59 N.E.2d 695, 698.

The First Post War Agreements required that each dealer purchase a specified number of service units per year for the first five years of the contract. These purchases have long since been made. In the Second Buff Contracts, the dealer was required to purchase a specified number of water softening units. Thus, Samuels promised to purchase 250 units each year for ten years, and Geiger agreed to purchase 50 units per year for the first five years and 25 units per year for the second five-year period. No claim is made that the dealers under the Second Buff Contracts have not fully carried out their commitments.

We hold that under the circumstances of this case, the dealer franchise agreements, after the excision of the requirements provision, are not void for want of mutuality or failure of consideration.

▆ We next consider Culligan's argument that plaintiffs are in pari delicto, and thus the law should leave the parties where it finds them and afford no relief. Each of the plaintiffs did sign the franchise agreement tendered by Culligan. It is without dispute that no plaintiff would have been recognized by Culligan as a Culligan dealer had not the franchise agreement been signed. It was the requirements provision in that contract

---

3. The Record of the Association of the Bar of the City of New York, Volume 14, No. 7, October, 1959.

that was illegal under Section 3 of the Clayton Act. Culligan seeks to use this illegal provision as an excuse for avoiding its own contractual obligations.

In enacting the Clayton Act, Congress had in mind the protection of dealers. The House Report[4] stated the legislation was designed to prevent an unfair trade practice which was " *  *  * *unfair to the local dealer* and to the community *  *  **."* (Emphasis supplied.)

■ Courts are reluctant to invoke the doctrine of *in pari delicto* where to do so would manifestly work an injustice. Allgair v. Glenmore Distilleries Co., D.C.S.D.N.Y., 91 F.Supp. 93.

■ Corbin, in his treatise on contracts (6 Corbin, Contracts, § 1540 (1951) ) states:

"If a bargain is illegal, not because a performance promised under it is an illegal performance, but only because the party promising it is forbidden by statute or ordinance to do so, the prohibition is aimed at that party only and he is the only wrong doer.  *  *  * The other party, being himself subject to no prohibition or penalty, may even be one of the class of persons for whose protection the prohibitory statute was enacted.

"In these cases the refusal of all remedy against a party to the illegal bargain would penalize the very persons for whose benefit the making of such a bargain is prohibited or declared illegal. In such cases, in order to attain the purposes of the law, the courts have frequently enforced the bargain by one or more of the usual remedies, in favor of a party for whose benefit the law was intended and against a party toward whom the prohibition or penalty was directed.  *  *  * There is no reason why, in a case otherwise proper,

a decree for specific performance should not be granted."

We hold the case at bar is not one in which the defense of *in pari delicto* may be used to deny relief to the plaintiffs.

■ Defendant strongly objects to the conclusion of law of the District Court that Culligan cannot interpose the consent decree as a defense in this action since Culligan voluntarily agreed to the consent order. We think this contention is well taken. Culligan agreed to the order some six months after the filing of the complaint by the Federal Trade Commission. Consent judgments are ordinarily enforceable in the same manner as other judgments. A consent judgment operates as a *res judicata*. However, this erroneous conclusion is a harmless error. It was not necessary to the decision of the District Court. We have given no weight to this conclusion in reaching our decision herein.

Culligan complains of the equitable relief granted in the decree of the District Court. The Court restrained Culligan from "refusing to sell Culligan products to any plaintiff because said plaintiff has declined to accept and execute any other form of agreement as a substitute for its franchise agreement, or because said plaintiff has instituted this action for declaratory judgment."

■ We think the decree framed by the District Court preserves to plaintiffs their most important asset, the good will represented by their business names. The protection of good will has, in the eyes of the Chancellor, always been of great importance. We hold the equitable relief granted by the District Court was justified by the facts in this case.

Defendant has discussed other points in its briefs. We have considered same and find them to be without merit.

The judgment of the District Court is Affirmed.

4. H.R.Rep. No. 627, 63d Cong., 2d Sess., Pg. 11.