**SEALY MATTRESS COMPANY OF SOUTHERN CALIFORNIA, a California corporation, et al., Plaintiffs, Counter-Defendants,**

v.

**SEALY, INC., a Delaware corporation, Defendant, Counter-Plaintiff.**

**No. 68 C 1390.**

United States District Court,
N. D. Illinois, E. D.
June 19, 1972.

**354**

Bernard J. Nussbaum, Sonnenschein, Levinson, Carlin, Nath & Rosenthal, Chicago, Ill., for plaintiffs.

Richard S. Rhodes, Chadwell, Kayser, Ruggles, McGee, Hastings & McKinney, Chicago, Ill., for defendant; Hugh W. Gibert, Haas, Holland, Levison & Gibert, Atlanta, Ga., Co-Counsel.

## MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

Recalling (1) the demeanor and intonations of the witnesses and (2) the persuasive impact of testimony and argument, the Court as trier of fact in this cause, has fitted the stream of conflicting statements of alleged facts into a pattern of evaluation and judgment; and is now ready to rule.

Plaintiffs Sealy Mattress Company of Southern California (Southern), a California corporation having its principal place of business in that state, Sealy Mattress Company of Northern California (Northern), a California partnership having its principal place of business in that state, and Seniel Ostrow, a California citizen, seek *inter alia* the deletion of certain sales restriction provisions from their present license contracts and the enforcement of the non-deleted remaining provisions of their license contract against Sealy, Inc. (Sealy), a Delaware corporation having its principal place of business in Illinois. The crux of the controversy is whether the Southern and Northern Sealy license contracts survived a 1960 civil antitrust suit filed in this District by the United States against Sealy, Inc., United States v. Sealy, Inc., 60 C 844 (*Sealy* antitrust case).

Jurisdiction is premised upon 28 U.S. C. §§ 1332 and 2201.

Responding to a United States Supreme Court mandate, the District Court (Austin, J.) entered a "Supplemental Final Judgment" holding *inter alia* that Sealy and its licensees had unlawfully agreed "to allocate territories for the sale of Sealy products." Sealy took the position that the impact of that holding was to render all of its then existing license contracts wholly void. Accordingly, Sealy demanded on May 31, 1968, that Southern and Northern *sign* new and different contracts within a sixty day time limitation or else their right to manufacture and sell under the Sealy trademark would be terminated. Plain-

tiffs refused to sign the new license contract and this declaratory judgment action followed.

In 1936 and 1937 the California manufacturers and Sealy entered into written "Manufacturer's Contracts" which obligated each manufacturer licensee to manufacture Sealy products in its allocated territory according to Sealy manufacturing specifications. The California manufacturers were restricted in their use of Sealy patents and designs to the manufacture and sale of Sealy products and to manufacture such products in accordance with Sealy processes, methods and directions. The contracts further provided for the use of the Sealy name and labels by the manufacturers in their advertising and promotion of Sealy products.

Reciprocal sales restriction provisions of the license contracts obligating the California manufacturers to restrict their sales of Sealy products to a specified area and prohibiting Sealy from selling or licensing in the same area were held invalid. The impact of that invalidity on the remainder of the contracts constitutes the area of disagreement between the parties.

Plaintiffs urge that the contracts survive with the invalid portions severed. It is defendant's position that the territorial sales restrictions contained in the 1936 Southern license contract and the 1937 Northern license contract were of such vital importance to those contracts, that to cut them out would be to cut the very heart out of the agreements. Alternatively, Sealy contends that the franchise system created by the Sealy manufacturers is in the nature of a joint venture relationship that has developed over a period of years for the mutual advantage of all of the participants and that this lawsuit involves more than merely a contract between two persons. Involved is a contractual relationship evolved and developed by the parties over the years—a contractual *modus operandi* existing *de hors* the written 1936 and 1937 California license contracts. A licensee's election to be a part of the afore-described relationship imposes an obligation, enforceable in equity, to be bound by the same rules and contractual obligations as all other licensees; and that where the overwhelming majority of licensees have fixed upon a uniform, non-discriminating method of determining royalties, it is Sealy's contention that it is the obligation of each participant to contribute his fair share on the same basis as all the others.

*In limine* it is to be noted that while Sealy now contends that plaintiffs' pre-antitrust judgment contracts are "void and of no further effect," Sealy's proposed new post-antitrust judgment contracts preserve those very void and no longer effective contractual rights to "any existing breach of said prior Contract" and further provides that the new agreement replaces the old only "from and after the date hereof."

■ The Sealy antitrust case judgment did not void the license contracts *in toto*. If the District Court had determined to void Sealy's license contracts, appropriate and simple language was at hand. See, for example, the decree involved in United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957), where license agreements had been decreed "illegal, null and void." All that the Supplemental Final Judgment decree did was to order Sealy to require its licensees as a condition to the continuation or the issuance of any license to manufacture or sell products under any Sealy, Inc. trade name or trademark, that they file with the Court their consent to be bound by the terms of said judgment; and to cancel the licenses of those licensees who refused to file their consent to be bound. It is undisputed that the California licensees did consent to be so bound.

The District Court itself has in effect confirmed that the Supplemental Final Judgment did not automatically void the contracts and did not preclude severance. On October 10, 1968, Judge Austin advised the Executive Committee of this Court as follows (Letter dated October

10, 1968 from Hon. Richard B. Austin, United States District Judge, to the Executive Committee, on file in this case; see Tr. 110–16):

"  .   .   .  I have given consideration to the possibility of retaining the case on the basis of the retention of jurisdiction clause in the judgment entered in 60 C 844. A reading of the complaint in 68 C 1390 (the instant case) shows that it is not brought for the purpose of securing compliance with or clarification of that judgment.

"The alleged use by the defendant Sealy, Inc. of the judgment in 60 C 844 as a means of sanctioning its cancellation of all franchise agreements and thus to engage in renegotiation of an entirely new franchise evokes principles of contract law and must be determined from the provisions of the franchise agreement itself. Admittedly reference to that judgment must be made to determine what conduct and activity had been proscribed, but such consideration must be made in the light of what the franchise or license agreement provide. Cf. Beloit Culligan Soft Water Service, Inc. v. Culligan, Inc., 274 F.2d 29 (C.A. 7, 1960).

"Insofar as the franchise agreements expressly contain clauses interdicted by the judgment in 60 C 844, the issue of divisibility of the contract must be governed by contract law; and whether such franchise or license is intrinsically or in toto illegal because of the judgment in 60 C 844 is also dependent upon the terms of the agreement. No such element was involved in 60 C 844. The Supplemental Final Judgment in 60 C 844 (Part III, page 2) requires that a franchise or licensee

'as a condition to the continuation . . . of any franchise or license to manufacture or sell . . . file with the court . . . consent to be bound by the terms of the Final Judgment . . .'

and a failure to so file mandatorily requires the defendant Sealy, Inc. to cancel such franchise or license. The plaintiff here alleges it has filed its consent to be bound by that Judgment."

Judge Austin's clear expression that the Supplemental Final Judgment did not *ipso facto* void the license contracts forecloses argument to the contrary.

It is to be remembered that the very terms of the decree resulted from negotiations between the Government and Sealy. There is not the slightest indication that during the negotiations Sealy ever indicated to its licensees or anyone else that in Sealy's judgment the decree required, or even sanctioned, voiding the existing contracts and imposition of new ones. Much less was there any indication that any new contracts that might be offered would contain changes—including changes in the royalty and termination provisions—admittedly having nothing whatever to do with anything even remotely connected with the *Sealy* antitrust case.

Rather, the evidence is that Sealy—or at least its Board of Directors and licensees as distinguished from its officers —had not the remotest thought that the Supplemental Final Judgment would some day be used as a club to force new contracts on the licensees. Even I. L. (Irving) Fisher, the very Sealy Board member who made the December 6, 1967 motion authorizing Sealy to consent to the Supplemental Final Judgment, had no inkling that Sealy would some day claim that the license contracts of "consenting manufacturers" (including his own) were thereby *ipso facto* rendered void.

Instead, Sealy Board minutes plainly reflect that only those licensees who might refuse to consent to the decree would lose their license contracts. The minutes state in pertinent part:

"During the discussion it was again emphasized that all Sealy licensees will be obligated to sign the decree which will be presented; and Sealy, Inc. will be ordered to cancel the con-

tract of any licensee who might refuse to do so."

The emphasis at the Sealy Board meeting that Sealy would only have "to cancel the contract of any licensee" who would not consent to be bound by the antitrust decree was entirely accurate. Sealy's post Supplemental Final Judgment view that the decree required new contracts was baseless. It did provide Sealy with the opportunity to impose a single uniform license on all Sealy manufacturers—a Sealy endeavor which had been underway for at least two decades.

As the evidence demonstrates, the *Sealy* antitrust case and the Government-Sealy negotiations leading to its formation simply did not compel cancellation of the license contracts. Even less did it give the slightest color of sanction for Sealy's overreaching attempt to compel the California manufacturers to sign new contracts that went far beyond the mere physical severance of the unlawful sales restrictions. Indeed, new contracts were not needed to eliminate the invalid sales restrictions, since arguably severance had already been accomplished by the combined force of the Supplemental Final Judgment and the severability clause contained in the license contracts.

Yet it was because of the changes in the new contract that were totally unrelated to the *Sealy* antitrust case— changes having to do with royalties, sales quotas, termination and the like— that the California manufacturers refused to sign the new contracts. Having nothing to do with the antitrust case, these changes imposed significantly new and additional burdens on the California licensees. Not only is there no basis in the Supplemental Final Judgment for Sealy's tactics, but the pre-antitrust-judgment licensee contracts themselves demonstrate that they survive with the sales restrictions severed.

Simply stated, the invalid sales restrictions are "severable by reason of the severability provision contained in the agreement." Buckeye Garment Rental Co. v. Jones, 276 F.Supp. 560, 562 (E.D.La.1967). "The agreement itself provides that if any part of the agreement is held to be void for any reason, the remainder of the contract will still be enforceable." Union Tank Car Co. v. Lindsay Soft Water Corp., 257 F. Supp. 510, 514 (D.Neb.1966). In their contracts Southern and Northern agreed with Sealy that, "this contract shall be deemed separable and if any portion hereof shall be held invalid for any reason, the remainder shall not thereby be invalidated but shall remain in full force and effect."

The severability clauses contained in the Sealy-Southern and Northern license contracts are plain and unambiguous. As the Court held in Standard Title Insurance Co. v. United Pacific Insurance Co., 364 F.2d 287, 289 (8th Cir. 1966):

"If the contract is not ambiguous, then its provisions as written must be accepted without resort to any rules of interpretation and intent of the parties must be determined from the language used in the written contract."

See Founders' Insurance Co. v. Lanco Development Corp., 221 Cal.App.2d 503, 34 Cal.Rptr. 522 (2d Dist. 1963); Cimino v. Cimino, 93 Ill.App.2d 412, 236 N. E.2d 299 (1st Dist. 1968); Whiting Stoker Co. v. Chicago Stoker Corp., 171 F. 2d 248 (7th Cir. 1948).

Under the most basic principles of contract, Sealy "cannot now be heard to claim, for its own benefit, that the actual undertaking of the parties was other than that which appears in their written agreement . . . . Even though it might prefer to have the court decide the plain effect of this agreement to be contrary to the expressed intention set forth in the contract between the parties, it is not within the power of the court to make a new or different contract." Osborne v. Locke Steel Chain Co., 153 Conn. 527, 218 A.2d 526 (1966).

The evidence disclosed that the territorial sales restrictions were under Government attack for many years, yet there was never the slightest suggestion from Sealy or the licensees that these restrictions of doubtful validity were exempt from the severability provisions that are part of every Sealy license contract.

There was never any indication that the severability provision did not apply to the challenged sales restrictions. There was never any comment that if these restrictions were held illegal the entire contract would be rendered void. There was never any effort to amend the severability provision to exclude from its ambit the sales restriction portions of the license contracts. There was never any oral statement hedging the plain scope of that provision. Neither Sealy nor any licensee attempted to limit the license contract by reserving an option to withdraw if the sales restrictions were declared invalid. There was no mention made to anyone that the severability provision did not mean exactly what it said. The lateness of the hour makes it most inappropriate for the severability provision to now undergo a change in meaning.

The invitation to rewrite or to ignore the severability provision has its genesis not in the Supplemental Final Judgment but in Sealy's desire to impose a uniform license contract on the California manufacturers. As the Supreme Court said in S S Monrosa v. Carbon Black Export, Inc., 359 U.S. 180, 183, 79 S.Ct. 710, 712, 3 L.Ed.2d 723 (1959), "In accordance with the familiar rule . . ., we will not stretch the language when the party drafting such a form contract has not included a provision it easily might have."

█ Even absent a severability provision, whenever possible courts will enforce the valid parts of partially unlawful contracts. See e. g., Zajicek v. Koolvent Metal Awning Corp., 283 F.2d 127, 133 (9th Cir. 1960); Keene v. Harling,

61 Cal.2d 318, 38 Cal.Rptr. 513, 392 P.2d 273, 275 (1964); Joy Mfg. Co. v. Julian Petroleum Corp., 208 Cal. 168, 280 P. 952, 953 (1929). The Seventh Circuit is at the very forefront in enunciating the principle that whenever possible provisions found to violate the antitrust laws ought to be severed, with the remainder of the contract declared to remain in full force and effect even when the contract does not contain a severability clause. Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), aff'g 257 F. 2d 48 (7th Cir. 1958).

In the case at bar it is clear that an "intelligible economic transaction" (see *Kelly* Supreme Court holding, 358 U.S. at 521, 79 S.Ct. 429) remains after the illegal sales territorial provisions are severed from the California manufacturer-licensees' contracts.

For example, the obligation of the California manufacturers to manufacture Sealy products, the license to do so, Sealy's obligation not to license anyone else to manufacture in the territory, the California manufacturers' obligation to promote and attempt to fulfill the demand for Sealy products in their area, their obligation to meet Sealy's specifications, etc., all continue unabated. So too, the very significant obligation of the California manufacturers to pay royalties to Sealy persists undiminished.

The California licensees had only that which Sealy gave them and as the evidence disclosed, their understanding of what they were getting from Sealy was the right to use the Sealy tradename in the sale and manufacture of Sealy products in assigned territories. That right continues to exist and is found in Sealy's proposed new contracts.

As the evidence revealed the right to use the Sealy tradename was of primary importance to the licensee. The Kaplan testimony is not to the contrary. Because of his financial situation prior to becoming a Sealy licensee, the sales restriction provisions were most appealing to him. By contrast, the Fisher testi-

mony was to the effect that not only were the sales restriction provisions of little concern to him but, indeed, he was not entirely pleased with his assigned territory—his feeling being that the assigned area was much too large for him to adequately handle economically. The Fisher and Ostrow testimony was to the effect that the central imperative for them as licensees was the purchased right to use the Sealy name.

There is no doubt that the territorial sales restrictions were a matter of life and death to Mr. Kaplan. Yet the sales restrictions merely accompanied his tradename. As the record will show Mr. Kaplan is still alive. He, Sealy, and the Sealy licensees not only live but as the record reveals they have prospered without the territorial sales restrictions. The heart of the license agreements is the right to use the Sealy tradename in the sale and manufacture of Sealy products in specified areas and that sale and manufacture territorialization remains in the present Sealy-California license contracts and is found in the Sealy proposed license contracts.

■ Applicable principles of antitrust law manifest a clear policy favoring the severance of invalid restrictions and the continued validity of the remainder of contracts. The governing antitrust principle is that "unless the Court, by its judgment, would be enforcing the specific conduct prohibited by the Act" the court will enforce the remainder of the contract with the invalid provisions severed. Beloit Culligan Soft Water Service, Inc. v. Culligan, Inc., 274 F.2d 29, 34 (7th Cir. 1959).

The principles synthesized in Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 431 (1959), are entirely applicable here:

"As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court . . . . The Court observed that the Sherman Act's express remedies could not be added to judicially by including the avoidance of private contracts as a sanction . . . . [T]he federal courts should not be quick to create a policy of nonenforcement of contracts beyond that which is clearly the requirement of the Sherman Act . . . . If the defense of illegality is to be allowed as a collateral method of enforcement of the antitrust laws, as the breadth of the petitioner's argument suggests, it must be said that his theory creates a very strange class of private attorneys general . . . . Past the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act, the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, 'of preventing people from getting other people's property for nothing when they purport to be buying it' . . . . Supplying a sanction for the violation of the Act, not in terms provided and capricious in its operation . . . is avoided by treating the defense as so confined." (358 U.S. 518–521, 79 S.Ct. 431).

Just as in *Kelly*, it would create "a very strange class of private attorneys general" here if Sealy were permitted to compel plaintiffs to enter into the proposed new and more onerous contracts because the territorial sales restrictions in the present contracts have been declared unlawful. Any such result would permit Sealy to impose additional financial and other burdens on the California manufacturers simply because Sealy lost the *Sealy* antitrust case.

It is settled that severance of invalid provisions from contracts is the result called for by federal antitrust principles unless the enforcement sought by plaintiffs "would be enforcing the specific conduct prohibited by the Act." Beloit Culligan Soft Water Service, Inc. v. Culligan, Inc., 274 F.2d 29, 34 (7th Cir. 1959). No one is seeking enforcement of conduct prohibited by the antitrust laws in the case at bar.

In conclusion it is to be remembered that this is not a case:

(1) where any by-law of Sealy, Inc. provided that anyone who took a Sealy license took so subject to the power of the board of directors of that company to change the contract by by-law,

(2) where a contract provided that the board of directors of Sealy, Inc. at its option could modify the contract at any time it wanted to do so,

(3) where the plaintiffs' California licensees are not paying their fair share of royalties to Sealy, Inc. (As the record demonstrates the California licensees pay on the basis of actual sales almost precisely the same percentage royalty as every other Sealy licensee.),

(4) where a court has said because the contract violates the antitrust laws, that the whole contract must fall, and finally and most importantly this is not a case where all that Sealy, Inc. has tried to do is to tender new contracts to the California licensees with the illegal provisions excised and with the remaining provisions approximately the same.

Summarizing, the record discloses that:

(1) the Sealy antitrust case Supplemental Final Judgment did not purport to render the California manufacturers' license contracts void unless they failed to consent to that judgment,

(2) the California manufacturers did consent to the judgment,

(3) the contracts of the California manufacturers contain a severability clause which plainly and unambiguously provides for severance of any unlawful portions of the contracts and survival of the remainder,

(4) the defendants produced no evidence indicating that the severability clause did not encompass the territorial sales restrictions held invalid in the *Sealy* antitrust case, and

(5) the record is barren of any justification for Sealy's unilateral attempt to disregard the plain language of the contract, applicable contract law principles, and antitrust policy. Moreover, it appeared from the evidence that Sealy's motive for announcing that the contracts had become void was not to comply with the Supplemental Final Judgment. Instead, Sealy's purposes were to achieve Sealy's long-held goal of uniformity of contracts, to compel increased royalty payments from the California manufacturers, and to impose on them the other onerous conditions of the proposed new contracts.

■ Accordingly, it is hereby adjudged, ordered and decreed that the California manufacturers' contracts are severable and that the California manufacturers' contracts are not void but remain enforceable and in full force and effect with the exception of the severed territorial sales restrictions.

It is further ordered that Sealy is not entitled to terminate said contracts or to extract any condition more onerous on plaintiff-licensees as a prerequisite to continuing them as Sealy licensees.

A few words must be directed to Sealy's counterclaim, the gist of which is that Southern and Northern are not the California licensees. It is highly questionable what impact, if any, the Sealy counterclaim would have on the relief sought in the complaint. Northern, Southern and Ostrow are all parties to this case. A declaration of the severability of the sales restrictions is not dependent on the identity of the licensees.

A more than adequate answer to the licensee identity question of defendant lies in the "Plaintiffs' Post-Trial Answering Brief To Sealy's Counterclaim" which is hereby incorporated and made a part of the Court's findings of fact and conclusions of law.

Accordingly, the declaration of rights requested in the counterclaim is denied and the counterclaim is hereby dismissed.