**SUPERIOR BEDDING COMPANY, a corporation, Plaintiff, Counter-Defendant,**

v.

**SERTA ASSOCIATES, INC., a corporation, Defendant, Counter-Plaintiff,**

No. 69 C 1074.

United States District Court,
N. D. Illinois, E. D.
June 30, 1972.

Morris Solomon and Stanley J. Morris, of Kennedy, Golan, Morris, Spangler & Greenberg, Chicago, Ill., Howard P. Miller, of Buchalter, Nemer, Fields & Savitch, Los Angeles, Cal., for plaintiff.

Altheimer, Gray, Naiburg & Strasburger, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

Plaintiff Superior Bedding Company, a Nevada corporation with its principal place of business in Los Angeles, California, seeks *inter alia* in its First and Second Causes of Action the enforcement of its license agreement minus the agreement's illegal retail price fixing and territorial sales restriction provisions against Serta Associates, Inc., a Delaware corporation having its principal place of business in Chicago. In its Third, Fourth and Fifth Causes of Action Superior prays for *inter alia* certain relief under the anti-trust laws of the United States, more particularly the Sherman Anti-Trust Act, 15 U.S.C. §§ 1, 2, the Clayton Act, 15 U.S.C. §§ 15, 26, and the Robinson-Patman Price Discrimination Act, 15 U.S.C. § 13.

Jurisdiction is premised upon 28 U.S.C. § 1332 and the foregoing anti-trust acts of the United States.

Having observed such elements of behavior as expression, manner of speaking, bearing and attitude of the witnesses; having recalled the persuasive impact of testimony and argument; and having fitted the stream of conflicting statements of alleged facts into a pattern of evaluation and judgment, the Court is now ready to rule.

The evidence adduced at the trial and the facts admitted by the pleadings showed the following:

The business of Serta consists principally in the licensing of certain patents, trademarks and trade names which Serta holds on mattresses, box springs and other articles suitable for bedding purposes. Superior and other independent bedding manufacturers are Serta stockholders. Prior to September 30, 1968 Serta entered into Uniform License Agreements granting to Superior and other licensee shareholders the exclusive right to manufacture and sell Serta patented, trademarked and trade-named products in prescribed territories.

The annual license fees paid by the licensee stockholders provide the primary financing for Serta's operation. Serta itself does not engage in the manufacture of bedding or its sale to retail stores. Rather it sells advertising and promotional goods and products to its licensees requiring such licensees to buy from it, or through it from approved sources, such things as mattress ticking, inner spring assemblies and labels.

On May 31, 1960 the United States of America filed an action in this District Court entitled "United States of America v. Serta Associates, Inc.," 296 F. Supp. 1121, charging Serta and its shareholder licensees with conspiracy to fix retail prices and allocate exclusive

geographical sales territories in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Thereafter on September 30, 1968 this Court entered a Judgment providing, among other things, that Serta and its licensees had combined and conspired to fix retail prices and allocate exclusive geographical territories in violation of Section 1 of the Sherman Act. The Judgment further enjoined and restrained Serta and its licensees from, among other things, maintaining or entering into any agreement to limit or restrict any manufacturer in any substantial way to sales of Serta products within a prescribed territory. The Final Judgment also required that Serta cancel all provisions of its license, by-laws, rules and regulations which were inconsistent with any provision of the Judgment and, as a condition to remaining a Serta licensee, each licensee was required to file a written form of consent with the Court indicating agreement to be bound by the Final Judgment terms.

Superior filed such a written consent.

Taking the position that the effect of the Final Judgment was to void the entire license agreement then in existence between the licensees and Serta, Serta on or about March 11, 1969 presented its licensees with a "Temporary Franchise Agreement."

On May 12, 1969, Serta notified Superior that unless Superior executed the Temporary Franchise Agreement in its original form without change on or before May 22, 1969 Serta would unilaterally declare Superior's license invalid and cancel its rights as a licensee and shareholder. Superior refused to sign primarily on the ground that to do so would cause it to violate the injunctive provisions of the Final Judgment. As a result of this action on the part of Serta, Superior brought the present lawsuit.

Subsequent to the filing of the Superior lawsuit, Serta presented to its shareholder licensees a purported permanent *"New License Agreement"* and substantial *By-Law Amendments*, again,

with the threat that if the licensees did not approve the same, they would lose their license to manufacture and sell Serta products. Again, for the foregoing reason Superior refused to execute the same.

The parties agree that the first legal question to be resolved is whether or not the 1953 Serta-Superior License Agreement was voided by the entry of the Final Judgment in the aforementioned 1960 anti-trust case between Serta and the United States.

■ As a close reading of the Anti-Trust Decree or Final Judgment reveals, it did not declare the entire Serta-Superior license agreement invalid. Rather, it enjoined the continuation by Serta and its licensees of exclusive sales territories and required Serta and the consenting licensees to cancel only those provisions of the license which were inconsistent with the Judgment. It is apparent from a reading of the Judgment that its import was that the existing licenses would remain in effect with the excision of only those provisions relating to exclusive territoriality. Moreover, each licensee, in order to continue as such, necessarily filed a consent with the District Court to be bound by the Final Judgment. Implicit in each consent was an agreement to be bound by the existing license subject to the cancellation by the Final Judgment of the exclusive territorial sales provisions.

■ Such a reading of the Final Judgment is consistent with federal case law that the fact that a particular provision of a contract may be illegal under the anti-trust laws does not make the entire contract void or unenforceable.

In Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475, rehearing denied, 359 U.S. 962, 79 S.Ct. 796, 3 L.Ed. 2d 769 (1959), the most recent Supreme Court pronouncement on the subject, the Court flatly rejected a defense to an action for the purchase price of certain onions, that the agreement had been made as part of a conspiracy to fix

prices. At pages 518 and 521, 79 S.Ct. at pages 431 and 532 the Court said:

"As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act (2) has not met with much favor in this Court. * * * Past the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act, the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, 'of preventing people from getting other people's property for nothing when they purport to be buying it.' "

Several cases since *Kelly* have followed its rationale. See for example New York Automatic Canteen Corp. v. Automatic Canteen Co. of America, 1963 C.C.H. Trade Cases, ¶70, 625; Western Electric Co., Inc. v. Solitron Devices, Inc., 1967 C.C.H. Trade Cases ¶ 72, 057.

In particular, Beloit Culligan Soft Water Service, Inc. v. Culligan, Inc., 274 F.2d 29 (7th Cir. 1959) presents a striking parallel to the present case.

The facts in the *Culligan* case were very similar to those presented in the case at bar. There, as here, the plaintiffs were individual franchisees of a nation-wide franchise. There, as here, the plaintiffs had expended substantial money in developing territories prescribed by Culligan. Extensive advertising had been undertaken both on a local and national level. The Federal Trade Commission filed a complaint against Culligan charging a violation of Section 3 of the Clayton Act. Thereafter a Consent Decree was entered in which Culligan agreed to desist from this practice.

In that case, as here, there was no claim that the plaintiffs had breached their Franchise Agreement. Rather, as in the present case, Culligan argued that the contracts sought to be enforced by the plaintiffs were invalid and unenforceable in toto because they contained provisions which were in violation of Section 3 of the Clayton Act.

Affirming the District Court holding which was to the effect that after excision of the illegal provisions the contracts remained valid and enforceable; the Seventh Circuit in reviewing *Kelly* held at 274 F.2d 33, 34 that:

"In upholding the right of the plaintiff to recover, the Supreme Court recognized the validity of the defense offered but only in a very limited situation where the judgment of the court would be the vehicle by which the unlawful conduct is carried out. * * * We interpret the current view of the Supreme Court to be that a defense based on violation of Section 3 of the Clayton Act is valid if the contract at issue is intrinsically illegal; that is—if the Court, by its judgment, would be enforcing the specific conduct prohibited by the Act."

■ In view of the foregoing it appears well settled that where a contract is only partially illegal as the Court has found the Serta-Superior license agreement to be, and the illegal clause can be severed from the remainder of the contract, the remainder of the contract will be enforced.

There can be no doubt that the exclusive territorial sales restriction provisions were important to Serta licensees. But more important to them was the purchased right to manufacture and sell under the Serta tradename, mattresses and other bedding articles within a prescribed territory. Even with the severance of the illegal anti-trust provisions, that right would remain intact. That same right is found in the new license agreement. The licensees still retain their prescribed territories (called areas of primary responsibility), but due to the Final Judgment the licensees are no longer restricted to just their area. *Economics restricts them now, not a license provision.*

■ Territorialization in and of itself is not violative of the federal anti-trust laws. The federal anti-trust violation occurs when territorialization is

combined with territorial sales restrictions. Again, the right to territorialization the Serta licensees retain both under the old (with the illegal provisions severed) and the new license agreements. They still have prescribed territories under the new license agreement, only now, if they can economically do so, they may sell outside their specified areas. It is to be noted that no evidence was offered showing that any licensee had quit or threatened to quit the organization because the Court had declared exclusive sales territories illegal.

■ The judicial surgery, that is, the Final Judgment, did not cut the heart out of the body of the license agreement. True, a vital appendage was severed, but the heart continued to beat—numerous rights and obligations continued to live and the licensees themselves lived and thrived on the remaining provisions of the license agreement. For example, the right to use Serta patents, trademarks and trade names and the payment of royalties and fees to Serta for national advertising continued. Having found that the territorial sales restriction provisions were not a material part of the Serta contract, their illegality does not cause a failure of consideration.

Having found the 1953 agreement with the illegal sales restriction provisions severed therefrom valid and enforceable, the Court now turns to a point which materially differentiates the *Serta* case from Sealy Mattress Co. of Southern California v. Sealy, Inc., 346 F.Supp. 353.

Back in 1930 when Serta began, its organizers were faced with several alternatives for structuring the Serta organization. One alternative was to have each of the licensees enter into an elaborate license agreement that would attempt insofar as possible to foresee future developments. A better reasoned alternative and the one chosen by Serta was to enter into a license agreement with said agreement's material terms that were to be obeyed, imposed on or contracted for by the licensees contained in the by-laws, since the by-laws can change as time goes on.

The initial Serta license agreement did virtually nothing more than license a trademark, and then such agreement was subsequently amended to a license of a trademark with a right to sell in an exclusive territory. Since this amendment virtually every important detail that the Serta organization has had to accomplish has been contained in its by-laws.

For example myriad tried and rejected fee formulae can be found in various by-laws from 1935 to 1969. Serta has tried the Buying Power Index (BPI); flat fees; fees based upon sales; combinations of BPI; and a fee system under which there was a BPI formula with a companion restriction that no licensee be assessed over five percent and assessed under one percent. Serta history discloses that it has been a pragmatic organization attempting to meet its problems from year to year, by assembling together and constantly amending its by-laws. Serta history is a history of growth largely through by-law amendments.

Even though the 1953 agreement remains in full force and effect, in view of Serta's history, the complained of aspects of the Temporary Franchise Agreement could have been lawfully enacted under the 1953 by-laws.

■ It has long been settled that a corporation may amend its bylaws so long as there is either a grant of such right in the laws of the state wherein it is incorporated, or a reservation of the power in the corporate articles or by-laws themselves. See, *e. g.*, 8 Fletcher, Cyclopedia Corporations, Sections 4176–4177, Supreme Lodge v. Mims, 241 U.S. 574, 36 S.Ct. 702, 60 L.Ed. 1179 (1915) and Peterson v. Gibson, 191 Ill. 365, 61 N.E. 127 (1901). It must be remembered that Serta is a Delaware corporation and Delaware law so provides. Moreover, Serta's bylaws themselves have always so provided.

A legal presumption exists that a corporation exercises its powers according to law, that its bylaws are valid, and that "the burden of overthrowing them is upon the party who asserts their invalidity." McKee & Co. v. First National Bank of San Diego, 265 F.Supp. 1 (S.D.Cal.1967); 18 C.J.S. Corporations § 189 at 608.

An amended bylaw may operate to alter contractual rights where a contract with the corporation is expressly or impliedly made subject to future bylaws. Thus a stockholder such as Superior has no vested right in having any bylaw remain in force indefinitely and future amendments, especially if provided for in a contract, if reasonable, are valid and binding. In such a situation the only inquiry a court will make is as to the inherent reasonableness of the amendment. See *McKee*, 265 F. Supp. at 4 and cases cited therein.

There are, of course, boundaries and limitations imposed by law on the exercise of such right to amend. The law recognizes three limitations upon the right to affect the terms and obligations of corporate or corporate-like organizations. Any bylaw must (a) have a rational nexus to the organization's purposes, (b) be non-discriminatory in its application, and (c) refrain from depriving members of any right expressly granted in the basic agreement and not made expressly subject to revision of a so-called vested right. (See 8 Fletcher, Cyclopedia Corporations ¶4177 (Rev.Ed. (1966) and cases cited therein.)

Thus, there is no question that Serta had the corporate power to institute the 1969 bylaw amendment requiring the execution of a new form of standard license agreement. The sole question is whether the Temporary Franchise Agreement by cancelling the 1953 agreement and substituting itself in place thereof was unreasonable vis-à-vis the "substituted" terms, particularly where such terms already appear to have been contemplated in the old agreement.

As already has been shown by the foregoing discussion, under the 1953 agreement, Superior was subjected to various fee arrangements involving quota-like formulae. The 1969 bylaw amendment insofar as it concerned fee formulae did nothing that had not already been done numerous times before in Serta's history. Indeed, the entire Serta license agreement has for a substantial portion of its history been subject to change by a two-thirds majority vote of its shareholder licensees. Even though the 1953 agreement was valid with its illegal provisions excised, this did not prevent two-thirds of Serta licensees from enacting by customary bylaw amendment the Temporary Franchise Agreement. No evidence has been offered by Superior to show that the quota arrangement contained in the new bylaw amendments are unreasonable.

Plaintiff further objects to the Temporary Franchise Agreement on the basis that it prohibits a licensee from selling or exchanging in one or a series of transactions a majority of the voting stock of the licensee.

The 1953 license agreement executed by plaintiff provides in paragraph 10, that:

"Neither this contract nor any of the rights and licenses granted to the licensee hereunder shall be assignable by the licensee, or by operation of law or otherwise, to any person, firm or corporation and any assignment shall *ipso facto* terminate the right and license hereby granted to the licensee."

Provisions such as the foregoing are customary in any trademark license agreement. Under the Lanham Trademark Act, 15 U.S.C. § 1055 et seq., a trademark licensor must exercise such control or lose its trademark rights. Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358 (2nd Cir. 1959); R. C. W. Supervisor, Inc. v. Cuban Tobacco Co., 220 F.Supp. 453 (S.D.N.Y.1963). Paragraph 10 of the old license agreement and the complementary provisions of the by-laws long in effect have always

prohibited transfer of the Serta license and make clear that Serta has always been critically concerned with having its licenses in the hands of only firms of the highest character and competence.

Plaintiff apparently believes that a "loop-hole" for evasion of this long standing provision existed under the old license agreement. The new Serta license agreement contains terminology prohibiting in detail indirect assignment through transfer of ownership of a majority of a licensee's stock, to wit, that the licensee may seek Serta's consent to such indirect transfer and that "such consent shall not be unreasonably withheld."

■ It is to be remembered that the old license agreement expressly prohibited assignment of the license, directly "or otherwise." Neither Superior nor any other member-licensee has ever had any right to transfer the Serta license, directly "or otherwise," as by transferring ownership of the member-licensee itself. Thus the new non-assignment provision merely makes explicit what was always implicit. Moreover the provision is eminently reasonable.

By way of summary, it is apparent that notwithstanding the validity of the 1953 agreement with its severed provisions Superior was properly required to sign the new standard license agreement pursuant to a duly amended bylaw; that both the requiring of the new agreement and the two afore-mentioned new terms and conditions of same were legal and reasonable; that the two foregoing new terms and conditions were not only legal and reasonable but were also consistent with past practice of Serta and could have been introduced by way of bylaw amendment even without the new agreement; and finally superior has introduced no evidence and cited no authority in opposition.

■ The crux of Superior's antitrust allegations lies in the attack upon Serta's newly implemented "pass-over" plan which was instituted by bylaw, enacted by shareholder resolution and became part of the bylaws. All of the testimony adduced from Serta officers, auditors and licensees made it clear that following the invalidation of exclusive sales territories, the "pass-over" plan was instituted to secure for each licensee a benefit to each from its expenditures for national and local advertising, and thus secure the good will of each licensee.

The Court is unaware of any case which has held pass-over fees illegal *per se* in concept or operation. It is thus manifest that the pass-over concept like any other business practice may be violative of the Sherman Act if it constitutes an unreasonable burden on competition in operation and effect.

The only relevant question then is whether or not a profit pass-over of 7%, whereby one licensee pays 7% of the gross receipts on a sale outside of his area of primary responsibility to the licensee into whose area the sale is made, makes it impossible for a licensee to make sales outside of his own area at a profit. It is Serta's position that a 7% pass-over fee fairly compensates the licensee into whose territory the merchandise is shipped for his loss of advertising expenditures, sales efforts, and good will, nevertheless allowing the licensee who must pay the fee room for a profit.

The Serta position is based upon a study made by Arthur Young & Company, a nationally known public accounting firm whose services Serta engaged, to conduct an extensive investigation into the aforementioned question and to determine, based upon actual performance data from various licensee operations, an appropriate percentage figure for a pass-over fee which would compensate the receiving licensee fairly and at the same time impose no obstacle to inter-area sales.

Very simply, the Arthur Young Report showed that of the licensees examined the fixed selling expenses were two percent and the fixed advertising expenses were five percent. Serta took the position which is supported by the evi-

dence that if a licensee spends two percent of his income selling and five percent advertising, and that is his fixed expenses, and a competing licensee enters a licensee's area of primary responsibility and takes advantage of that, then the pass-over rate is defensible at seven percent.

Serta has maintained a standing objection throughout the trial herein regarding Superior's fourth cause of action based upon an alleged violation of the Robinson-Patman Act. Plaintiff's position on the theories underlying its Fourth Cause of Action has changed continuously—indeed, on the very day of the post-trial oral arguments a new theory was proposed.

 It is true that Superior has suffered discrimination in the sense that it has not been afforded relief of any kind from royalty payments whereas the New York and Chicago licensees were afforded such relief. And while it would be fairer and more reasonable to give licensees like Superior who pay tremendous amounts of royalty payments a number of votes in proportion to the amount of money they contribute to the Serta organization, Serta's failure to act reasonably in that regard does not amount to a legal wrong under the Robinson-Patman Act. While the other discriminatory acts of Serta towards Superior are both unfair and unreasonable (those in which Serta refuses to afford any relief from the royalty payments), they do not amount to the substantial acts of discrimination contemplated under the Act.

Accordingly, for the grounds and legal analysis stated in Section IV of Defendant's Trial Brief at 59 et seq., which Section is incorporated by such reference and made a part hereof, the standing objection of the defendant to the evidence pertaining to the Fourth Cause of Action of the plaintiff is sustained and an order striking all such evidence is hereby entered.

It is further adjudged, ordered and decreed that plaintiff even though the

1953 agreement would have been valid with the illegal provisions severed therefrom, cannot properly complain about the new agreement's terms and conditions regarding quotas, pass-over fees, and license transferability restrictions since such terms and conditions as evidenced by Serta's history of bylaw amendment could have been effectuated under the 1953 agreement. The aforegoing terms and conditions have been found to be both legal and reasonable by this Court.

It is ordered that for Superior to remain a Serta licensee it must consent to the 1969 bylaw amendments.

Serta is ordered to refrain from any and all acts of reprisal against Superior for exercising its right to file suit when confronted with a legitimate basis for so doing.