**UNITED STATES of America,
Plaintiff,**

v.

**SERTA ASSOCIATES, INC., Defendant.**

**No. 60 C 843.**

United States District Court
N. D. Illinois, E. D.

Aug. 9, 1968.

Judgment Affirmed Feb. 24, 1969.

See 89 S.Ct. 870.

John E. Sarbaugh, Bertram M. Long and Harold E. Baily, Antitrust Division, Chicago, Ill., for the United States.

Alan J. Altheimer, Lionel G. Gross, Howard L. Kastel and Roger B. Harris, Altheimer, Gray, Naiburg, Strasburger & Lawton, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

DECKER, District Judge.

The Government alleges that defendant Serta Associates, Inc. and its stockholder-licensees combined and conspired to fix retail prices and allocate exclusive geographical territories in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. After a lengthy trial, I conclude that both allegations have been sustained.

Serta is a Delaware corporation with its headquarters and principal place of business in Chicago, Illinois. All of its stockholders are independent bedding manufacturers which have contracts with the defendant to use Serta trademarks within mutually exclusive territories. Besides registering trademarks, Serta also adopts specifications for its trade name bedding and conducts extensive advertising. During 1931, the year in which it was incorporated, Serta granted licenses to fourteen formerly independent regional mattress manufacturers; currently, there are forty stockholder-licensees located throughout the United States. The licensees' annual fees, currently amounting to more than one million dollars, provide the primary financing for Serta's operations.

Though the defendant strenuously maintains that its by-laws and regulations impose vertical restrictions on the licensees, the internal organization of Serta Associates indicates that it is the product of horizontal cooperation among manufacturers who might otherwise compete with one another. The stockholder-licensees select the Board of Directors and chief executive official who, in turn, actively manage the defendant's business affairs. Annual meetings are held at which the licensees propose, discuss and vote upon resolutions of mutual interest, adopting rules that are binding upon them all. Normal topics for these meetings include suggested retail prices and cooperative advertising programs.

The complaint was originally filed in May 1960, but the trial was stayed pending the outcome of a contemporaneous companion case, United States v. Sealy, Inc. After the district court held that Sealy had fixed prices, 1964 CCH Trade Cases ¶71,258, the Supreme Court held that the company's allocation of exclusive territories, when combined with its unlawful price fixing activities and policing, was illegal *per se,* United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). The *Sealy* case and the instant case present virtually the same facts; both are essentially horizontal combinations which have conspired to fix prices and allocate closed geographical territories. The Government alleged identical antitrust violations in the two cases, and the evidence produced at the two trials is quite similar.

By stipulation between the parties, the following facts were established:

"Since at least 1933, Serta Associates, Inc. has had a continuous agreement with each of its licensees not to license any person to manufacture or sell Serta products in a licensee's designated area; and each licensee has agreed not to manufacture or sell Serta products outside its designated area.

"Since 1940, Serta Associates, Inc. and its licensees have adhered to and enforced the mutually exclusive-territorial agreements."

On the Government's representation that the proof in this case would be sub-

stantially similar to that in *Sealy,* this court decreed that the trial would initially concern only the price fixing issue. If the Government prevailed on that issue, the doctrine of *Sealy* would then apply so that trial of the territorial allocation issue would not be necessary.

The evidence may be roughly divided into three categories: (1) the by-laws, rules and regulations of Serta, (2) the uniform license agreement entered into by Serta and each of the licensees, and (3) ninety specific instances of conduct by the defendant which, according to the Government, indicate that the rules, regulations and license agreements constitute an attempt to fix prices. The evidence is discussed as a whole in the first section of this opinion. Thereafter, I will deal with three specific aspects of the case: first, Serta's advertising practices; second, its rules, regulations, and licenses, ignoring the defendant's conduct; and, finally, Serta's argument that interbrand competition in the bedding industry is relevant to this decision

## I. PRICE FIXING GENERALLY

■■ Since United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), it has been clear that price fixing is *per se* illegal. This includes any tampering with price,

regardless of whether that be minimum or maximum prices; see Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). In flagrant violation of this prohibition, the shareholder-licensees of Serta Associates, acting as the Board of Directors, the Executive Committee, and as shareholders, met regularly and discussed and fixed the retail prices at which Serta products would be advertised and sold.[1] Moreover, Serta licensees requested their dealers to maintain advertised retail prices and minimum retail prices; the retailers were also asked to limit comparative price advertising. In response, the licensees routinely received assurances of cooperation from the dealers. Advertising and sales below the suggested prices were policed by Serta and the licensees; those who violated the rules were reprimanded and, occasionally, cut off from Serta products.[2]

## A. THE AGREEMENT BETWEEN SERTA AND THE LICENSEES

The Government introduced evidence of ninety "incidents," occurring between 1939 and 1967, in which Serta Associates and/or its licensees tried to influence prices.[3]

1. There has been no allegation that the licensees have conspired with their dealers (the retailers) or that the retailers have cooperated with one another; such further collaboration may not have been necessary if the Serta-licensees' agreement, when combined with the exclusive territories, exerted sufficient influence on prices.

2. In 1958 Serta Associates headquarters and the Nashville licensee complained to the Chattanooga licensee about price cutting on the "Serta Posture" by the Factory Furniture Company of Knoxville, an outlet owned and supplied by Fielden Furniture Store, Knoxville, Tennessee. Thereafter, the Chattanooga licensee discontinued selling Serta mattresses to Fielden, writing to Serta Associates that:
"We have never sold this firm [Factory Furniture Company] and

have no intention of selling them. We do know the source from which this merchandise was secured, and have advised the Fielden Furniture Company that we could no longer ship them since the management of this store is interested in the Factory Furniture Outlet."
Moreover, Joseph Marland, the representative of the Chattanooga licensee, testified at trial that he investigated these two stores through his salesmen and through a special Dun & Bradstreet inquiry.

3. For example, in 1939 the Hall Watson Furniture Company in Corbin, Kentucky advertised the "Perfect Sleeper" mattress and box spring in the *Corbin Tribune* for less than $39.50 each, the suggested retail price. The Chattanooga licensee sent copies of the ads to Serta Associates, requesting the national head-

**1124**

Defendant emphasizes that these incidents covered a period of almost thirty years, allegedly indicating that there was no conspiracy. Furthermore, Serta introduced a volume of repetitive testimony and numerous exhibits to demonstrate that deviations from the suggested price were permitted in actual selling prices.[4] These observations merely indicate that the conspiracy was less than 100% effective.

When the conduct of Serta and its licensees is combined with the by-laws,[5] rules, regulations, and standard license agreement,[6] defendant's attempt to fix prices is clear. Specifically, Serta's Rule 7, adopted in 1945, stated that:

"All Serta Identification Labels and Tags where a suggested retail price is shown are furnished to you with the understanding that you will request the cooperation of your local dealers in selling the article at the suggested retail price. In states where there is a Fair Trade Law in effect legally regulating the maintenance of resale prices, each licensee must properly qualify under such law." [7]

Similarly, by "preticketing" Serta products (i. e., affixing a retail price label), Serta and the licensees induced retailers to maintain the suggested retail prices. The licensees also distributed retail price lists and sales material containing the suggested prices to the dealers.

## B. ADVERTISING

Since 1940, Serta and its stockholder-licensees have periodically agreed upon minimum prices below which Serta mattresses could not be advertised, promulgating a "Local Advertising, Merchandising, and Sales Promotion" rule that is contractually binding on all licensees by their licenses. That rule (number two) has recently provided, in part, that:

"No Serta Member shall furnish Serta identified products to any dealer unless the dealer when using price comparisons in his selling and advertising shall limit same to not over ⅓ off."

quarters to reprimand the furniture store and to notify other licensees who might be able to force the dealer to stop its objectionable practices. The Treasurer of Serta then wrote to the Watson Furniture Company as follows:

"We are going to ask you to discontinue the practice of selling this mattress and box spring at less than $39.50 each and also any other of our nationally advertised merchandise at less than the resale price appearing on the label.

"In the event we find a repetition of this policy we shall be forced to turn the matter over to our attorneys and forced to take legal action."

Another illustration of Serta's policing occurred on July 11, 1961 when the Chicago licensee complained to Serta Associates that one of the Omaha licensee's retail store accounts in Muscatine, Iowa had sold "Perfect Sleepers" below the preticketed price and furthermore that Muscatine, Iowa was Chicago's and not Omaha's territory. The Chicago licensee filed a complaint charging that Omaha be fined $1,000 for this price and territory violation of the license agreement. Eventually, the Omaha licensee "ceded" the sales right to four Iowa counties to the Chicago licensee in September 1961, and the Chicago licensee withdrew his charges against the Omaha licensee. Thereafter, on September 26, 1961 the president of the Chicago licensee wrote to the president of the Omaha licensee as follows:

" * * * if at any time you hear of our dealers breaking the price of the Perfect Sleeper—or any other suggested retail prices, please feel free to let us hear from you immediately as we are most anxious to protect all Serta dealers."

4. Most of the instances of tolerated price cutting without reprimand or reprisal on the part of Serta occurred after the institution of these proceedings.

5. See, e. g., those adopted March 8, 1956.

6. E. g., paragraph eight.

7. In 1954 the phrase "must properly qualify" was changed to "urged to properly qualify."

Serta and its licensees have enforced this rule by policing both advertising and selling practices.[8]

In addition, Serta and its licensees influenced the retailers' advertised prices by offering cooperative advertising programs, whereby advertising mats, sales material, and a portion of the cost were supplied by Serta; however, a dealer was not allowed to participate in the program unless all of his advertisements contained Serta's suggested retail prices. When combined with the surveillance of all advertising, this practice hampered dealers who wanted to sell below the advertised price because they had only three options; they could advertise Serta standard items at the prices contained in the specifications, advertise without using a price, or refrain from any advertising.

## C. MISCELLANEOUS OFFENSES

In their attempt to stabilize prices, Serta and its shareholder-licensees also agreed that certain practices were so likely to disrupt the price structure that they should be forbidden. Specifically, no group selling arrangements were permitted with national or regional accounts unless that account maintained the advertised prices. Second, no "give aways" or "trade-ins" were allowed; these practices might otherwise have served to reduce the price actually being charged. Third, when mattresses were made to a dealer's individual specifications, no discounts in actual or advertised prices were permitted by the dealer.[9] Finally, advertising below the suggested minimum prices was forbidden during the period of semi-annual promotions.

## D. CONCLUSION

Serta's by-laws, rules, regulations, and standard license agreements, when combined with the numerous incidents documented by the Government's exhibits,

8. To illustrate, the General Manager of Serta Associates, Inc., by memorandum dated June 11, 1956, informed the San Francisco licensee about an ad run by Baker & Stanton in the *Humboldt Standard*, Eureka, California on June 28, 1956:

"* * * in which they are listing all types of Serta mattresses, including the Perfect Sleeper, etc., as stock they purchased from you that was shown in your San Francisco showroom. Prices are broken down from the regular prices and, as you know, this is not permissible."

Ten days later, in a separate incident, Serta's General Manager informed the West Palm Beach, Florida, licensee that he had a tear sheet from the July 5, 1956 *Key West Citizen* in which an ad was run by the Gomez Furniture Company listing a "SertaLux" box spring or mattress at $34.95. The General Manager stated further:

"I'm sure that you are well aware that, first, you cannot permit any dealer to sell Serta Lux Mattress below the advertised price of $39.95. * * *

"Please advise me immediately that you have taken this up with the dealer sending me copies of correspondence, etc., so that I may know that this has been stopped."

By letter dated August 2, 1956, the West Palm Beach licensee responded to the General Manager:

"In addition to policing the territory, so to speak, it is nice to know that you folks are keeping an eye on what is going on in the various territories."

9. Since 1955 Rule 6 has provided:

"6. No suggested retail price may be shown on any kind of label or tag including a price tab attached to any product carrying any kind of Serta identification including law labels showing Serta as a part of a member's factory name, or in any kind of advertising, merchandising, sales promotion or sales material used in connection with such product—*except* where used on a Serta standard item on which specifications and suggested retail price have been issued by the Serta Central Office—or *except* where used on a Serta labeled item made to a dealer's individual specifications, under his name, and with the definite understanding that such item will always be sold at the retail price shown on the label."

demonstrate that the stockholder-licensees met, discussed and agreed upon:

(a) The retail prices at which Serta products could be sold;

(b) The retail prices at which Serta products could be advertised;

(c) The comparative prices at which Serta stockholder-licensees and Serta retailers could advertise and sell Serta products;

(d) The minimum retail prices below which Serta products could not be advertised;

(e) The minimum retail price below which Serta products could not be sold;

(f) The means of inducing or enforcing adherence to these agreed-upon prices; and,

(g) The arrangements whereby each stockholder-licensee was granted an exclusive territory within which it could maintain retail prices free from any interference or competition from any other stockholder-licensee.

## II. PRICE FIXING: ALTERNATIVE GROUNDS

As indicated above, I believe the ninety instances of conduct by the defendant interpret and give additional meaning to the by-laws, rules, regulations and license agreements, indicating that these written documents constitute an agreement to fix the retail prices of Serta identified products. Even if I were to ignore those incidents, however, I would still find the defendant guilty of price fixing.

## A. ADVERTISING RESTRICTIONS

Serta and its licensees admit agreeing to regulate the prices at which Serta products could be advertised, both on the national level and within local markets. In order to advertise prices in the national media, such as network television and major magazines, the defendant must be able to employ a single price for its products; the Government thus concedes that the defendant may suggest retail prices in national advertising. On the other hand, interference with local advertising violates the strict *per se* prohibition of all tampering with price. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). For reasons explained below, all attempts to influence the locally advertised prices of the dealers are illegal, including price restrictions in Serta's cooperative payment program.

Two important reasons for having a *per se* price fixing rule are to prevent interference with competitive market forces and with traders' freedom. As stated in Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951), maximum price agreements, "no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." See Albrecht v. Herald Co., 390 U.S. 145, 152, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). The local restrictions clearly interfere with the retailers' freedom to advertise at the price they deem best. By restraining dealers from aggressive, price-cutting advertising, they also stifle competition among the retailers. In this day of mass media, price advertising is the very heart of vigorous competition. Since Serta's restraints on local advertising thus infringe the purpose of this rule they are also illegal *per se*.

Potential price cutters cannot inform the local public of their lower prices and thereby attract price conscious customers. With fewer customers, retailers do not obtain the full benefit of lower prices—a greater volume of sales. As a consequence, defendant's advertising restraints discourage retailers from lowering their actual selling price. Compare United States v. Parke, Davis & Co., 362 U.S. 29, 35, 80 S.Ct. 503, 4 L.Ed. 2d 505 (1960), where efforts to eliminate cut-price advertising were condemned in a vertical agreement case (normally treated more favorably than horizontal

agreements). Similarly, circulation of a price list among competitors was forbidden in Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), because the list prices were likely to be the prices for the future, thus allowing the competitors to price their merchandise accordingly; the instant local restrictions on advertising, when combined with the "suggested retail prices," result in an even more accurate prophecy of retailers' future prices.

## B. SERTA'S WRITTEN AGREEMENT

■ Defendant's massive attempt to overpower the government's "incidents" indicates an apparent failure to understand the broad sweep or the *per se* rule against price fixing. The antitrust laws condemn *all* price regulating agreements, not only those which are effective. Serta's by-laws, rules, regulations, and standard license agreements clearly indicate an attempt to stabilize prices for Serta identified products. See the discussion of rules 7 and 2 above. Serta maintains that the purpose of its price restraints is to convince the public that its products are of equal quality as those of competitors, particularly the Simmons company; Serta feels the public will not believe this if Serta products are priced far lower than those of Simmons. While improper motives may render unlawful certain otherwise legal practices, activities subject to *per se* condemnation are judged independent of the defendant's motives. Thomsen v. Cayser, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597 (1917); Standard Sanitary Manufacturing Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107 (1912). This is particularly true when a practice tends to stifle competition, as in the instant case.

## C. INTERBRAND COMPETITION

■ Finally, defendant argues that its agreement to stabilize prices should be excused because the Simmons company, which allegedly dominates the industry, can legally establish uniform prices throughout the country since it is a single integrated corporation. Dire consequences are hinted if Serta is not allowed to price its products in the same manner. Certainly it would be unfortunate if the Sherman Act's major result were to prompt merger, consolidation or liquidation by otherwise viable businesses. But see United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), concerning horizontal mergers.

Also, Serta maintains that the bedding industry is characterized by vigorous interbrand competition, and Serta says its practices should be excused for that reason. There may be situations in which such competition authorizes some conduct that is otherwise forbidden by the Sherman Act. Compare United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). An extraordinary situation must be present however, to warrant such special attention; an example might include a grave danger of reduced competition within the industry if the challenged practice were outlawed.

In the instant case, however, I see no reason why the cessation of price fixing will either hinder Serta's competitive position or undermine interbrand bedding competition generally. If anything, it should serve to stimulate competition in the mattress industry by allowing Serta's retailers greater freedom in discounting advertised and selling prices. Perhaps those reductions will, in turn, prompt similar price reductions by the industry's other major firms.

## III. SERTA'S TERRITORIAL ALLOCATIONS

■ In conformity with the Supreme Court's recent decision in United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), Serta's exclusive territorial allocations are also *per se* illegal. See United States v. General Motors, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Timken Roller Bearing Co. v. United States, 341 U.S.

593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). There is an "aggregation of trade retricts" present in the instant case, including both unlawful price fixing and illegal policing of that arrangement. Serta's territorial divisions are the product of a horizontal combination among the licensees as fully as was the case in *Sealy* (388 U.S. 352, 87 S.Ct. 1847).

The Supreme Court's description of Sealy, Inc. is also an accurate account of Serta's activities.

> " * * * The territorial restraints were a part of the unlawful price-fixing and policing. * * * [T]hey gave to each licensee an enclave in which it could and did zealously and effectively maintain resale prices, free from the danger of outside incursions. It may be true, as appellee vigorously argues, that territorial exclusivity served many other purposes. But its connection with the unlawful price-fixing is enough to require that it be condemned as an unlawful restraint and that appellee be effectively prevented from its continued or further use.

> " * * * [T]he arrangements for territorial limitations are part of 'an aggregation of trade restraints' including unlawful price-fixing and policing. * * * Within settled doctrine, they are unlawful under § 1 of the Sherman Act without the necessity for an inquiry in each particular case as to their business or economic justification, their impact in the market place, or their reasonableness." 388 U.S. 356–358, 87 S.Ct. 1852–1853.

Although defendant maintains that the Supreme Court's reference to "flagrant and pervasive price-fixing" (388 U.S. 355, 87 S.Ct. 1847) distinguishes this case from that one, I cannot agree for two reasons. First, Serta's price-fixing activity is both flagrant and pervasive; second, I interpret the *Sealy* opinion to require only an "aggregation of trade restraints" for territorial divisions to be *per se* unlawful, not an additional

finding concerning the quality of the price-fixing or other abuse.

### III.  CONCLUSION

For the foregoing reasons, both Serta's price fixing and its territorial allocations constitute violations of § 1 of the Sherman Act.  The Government will be given twenty days in which to submit its proposed order enjoining the defendant from continuing these abuses.