577 F.2d 910
 1978-2 Trade Cases 62,163
 In re NISSAN ANTITRUST LITIGATION.
P. D. Q., INC. OF MIAMI, Plaintiff-Appellant,
v.
NISSAN MOTOR CORPORATION IN U. S. A. and Nissan Motor
Company, Ltd., Defendants-Appellees.
 Nos. 77-1658, 77-2572.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 1, 1978.
 
 Fredric B. Burns, Miami, Fla., Judah I. Labovitz, Philadelphia, Pa., for plaintiff-appellant in both cases.
 Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for plaintiff-appellant in 77-1658.
 Morris F. Klein, Miami, Fla., Frank Cicero, Jr., Hammond E. Chaffetz, Jeffrey S. Davidson, Jeffery M. Cross, Chicago, Ill., for defendants-appellees in both cases.
 Bobroff, Olonoff & Scharf, New York City, for other interested parties.
 Leonard J. Bucki, Seymour Kurland, Philadelphia, Pa., Bert Sager, Miami, Fla., for plaintiff-appellant in 77-2572.
 John R. Hoehl, Miami, Fla., James E. Flynn, Chicago, Ill., for defendants-appellees in 77-2572.
 Appeals from the United States District Court for the Southern District of Florida.
 Before TUTTLE, COLEMAN, and CLARK, Circuit Judges.
 COLEMAN, Circuit Judge.
 
 
 1
 Nissan Motor Company, Ltd. (Nissan-Japan) manufactures Datsun automobiles and trucks.
 
 
 2
 It ships them to the continental United States and sells them to its totally owned subsidiary, Nissan-U. S. A. (Nissan-USA), which is responsible for the distribution and marketing of Datsuns in this Country.
 
 
 3
 Nissan-USA sells the vehicles to its franchised local dealers who, in turn, sell to their retail customers.
 
 
 4
 PDQ, Inc. of Miami (PDQ) is a local cartage company in Miami, Florida, owned by Bert Arkin, who is also its president. In late 1970, in Miami, PDQ (by Arkin) bought a Datsun sports coupe from a Datsun dealer. After a few months the coupe was sold, but its purchase was used as the springboard for this private antitrust class action which charged that in a nationwide conspiracy Nissan-USA and Nissan-Japan conspired or combined to fix prices in violation of the federal antitrust laws.[1] Relief was sought under § 4 of the Clayton Act, 15 U.S.C. § 15.[2] After a five week trial and five hours of deliberation the jury returned its verdict that no nationwide conspiracy had existed. In its brief to this Court, PDQ expressly declines to argue that the verdict was "against the weight of the evidence". For reversal it relies on asserted errors of law which will hereinafter be discussed.
 
 
 5
 The case comes here in the form of a consolidated appeal.
 
 
 6
 No. 77-1658 deals with errors claimed to have occurred during the trial on the issue of liability.
 
 
 7
 No. 77-2572 involves alleged error in the taxation of costs.
 
 
 8
 On the issue of liability the judgment of the trial court is affirmed. The cost award is affirmed in part and reversed in part. The case is remanded solely for modification of the order awarding costs.
 
 The Lawsuit
 
 9
 PDQ describes its complaint as one which alleged that Nissan-USA "combined and conspired with its Datsun franchised dealers to eliminate or limit dealer discounting in the retail sale of new Datsuns, thereby stabilizing prices at non-competitive levels".
 
 
 10
 The defendants appraised the complaint as charging "a conspiracy between defendants and Datsun dealers across the country to sell and advertise Datsun motor vehicles at fixed prices in violation of the Sherman Act".
 
 
 11
 PDQ says that "(T)he keystone of the scheme to stifle dealer discounting was the control of dealer advertising"; that Nissan's co-operative advertising program was a per se violation of the Sherman Act. This per se argument is the only arguably plausible issue left for disposition at the appellate level.
 
 
 12
 Under the antitrust laws, the United States, in June, 1972, filed an action for injunctive relief against Nissan-USA. The action alleged a conspiracy between Nissan-USA and its dealers throughout the United States to fix prices and to restrict territories and customer selection in the sale of Datsun vehicles. This case was settled by a consent decree in February, 1973.
 
 
 13
 In July, 1972, PDQ filed this private class action in the Southern District of Florida on behalf of all non-dealer Datsun purchasers in the United States. The allegations in PDQ's complaint were substantially identical to those in the federal suit. Once PDQ filed its suit, over two dozen other private antitrust actions were filed across the country, seeking similar relief. The Judicial Panel on Multi-district Litigation transferred all actions to the Southern District of Florida. See In Re Nissan Motor Corp. Antitrust Litigation, Jud.Pan.Mult.Lit., 352 F.Supp. 960; 385 F.Supp. 1253.
 
 
 14
 PDQ was certified as class representative for a class of purchasers of Datsun motor vehicles. PDQ, Inc. of Miami v. Nissan Motor Corporation in U. S. A., S.D.Fla., 1973, 61 F.R.D. 372. The class was certified so that the issues to be resolved were whether a nationwide conspiracy existed, and its effect, if any, upon the vehicle purchasers.
 
 
 15
 As heretofore stated, the jury, in response to special interrogatories, found that for the period in question there had been no "nationwide contract, combination, or conspiracy between Nissan-USA and its franchised Datsun dealers".
 
 
 16
 After the verdict, PDQ filed a motion for judgment notwithstanding the verdict or for a new trial. Eighteen grounds were assigned, including the contention that the trial court erred in refusing to instruct the jury that as a matter of law Nissan's cooperative advertising program was a per se violation of § 1 of the Sherman Act. All asserted grounds have been carefully evaluated and, except for the arguments as to the per se violation, are found to be so meritless as to require no discussion in this opinion.
 
 Background
 
 17
 Nissan-Japan was created in 1933, but Datsuns were not marketed in the United States until 1958. In that year, Nissan-Japan hired two independent trading companies, one on each Coast, to import new vehicles into the United States. These trading companies contracted with domestic retail car agencies to distribute the vehicles. This effort met with a notable lack of success.
 
 
 18
 Several marketing problems hampered the sales of Datsuns. The American public had never heard of the car and was reluctant to buy it. The vehicles were foreign made and selling for a low price; this raised the spectre of low quality. The domestic Datsun dealers were not promoting the product. Nissan-Japan was trying to enter a well established market, controlled primarily by domestic car manufacturers. Of a total of 6,500,000 new motor vehicles domestically sold in 1960, only 1,300 were Datsuns.
 
 
 19
 In an effort to cope with this situation, in September, 1960, Nissan-Japan created Nissan-U.S.A. as its wholly-owned subsidiary in charge of distribution and marketing of Datsuns in the United States. It replaced the trade companies formerly in charge of distribution and marketing.
 
 
 20
 Nissan-U.S.A.'s primary goal was to establish a strong network of retail dealers who not only would promote Datsuns but would also provide mechanical services and parts to Datsun customers. It knew that to start and maintain such a dealer network the dealerships had to be profitable. Nissan-USA could not afford a reputation for dealers going broke; buyers would have no confidence in purchasing a car on which they could not obtain service. Nissan-USA began hiring American auto industry executives who would carry out the marketing plans. These executives established a system for distributing the Datsun automobiles. A person is designated as a "franchise dealer" by Nissan-USA after a Datsun Dealer Sales and Service Agreement (franchise contract) is entered into by both parties. In this contract, Nissan-USA agrees to sell Datsuns to the dealers, provide expert advice in service areas, and promote the vehicles nationally. The dealer, separately from and financially independent of Nissan-USA, agrees to buy Datsuns from it, promote the vehicles locally, provide parts and mechanical service facilities, and sell the vehicles. A dealer hires his own personnel and is responsible for providing capital for a showroom, parts, inventory, and other expenses. While Nissan-USA has a legitimate concern with local operations, the local dealer is ultimately responsible for his own success or failure.
 
 
 21
 To help the local dealers with problems which may arise, Nissan-USA employs district managers to advise dealers. These managers also act as selling agents, keeping the local dealers supplied with new vehicles. During the early years of United States marketing and during the time with which this case is concerned, the district managers would advise the local dealer on promotion, advertising, and selling the new vehicles.
 
 The Alleged Per Se Violation
 
 22
 We now evaluate the operations of the cooperative advertising program which existed between Nissan-USA and its franchised dealers a program which PDQ insists was a per se violation of the antitrust law.
 
 
 23
 In the franchise contract, the individual local dealer agreed to belong to an advertising cooperative operated by Nissan-USA. The pertinent part of the franchise contract reads:
 
 
 24
 D. In order to give Dealer the advantage of comprehensive and coordinated dealer advertising consistent with Seller's National advertising program, a cooperative advertising fund may be established by Seller. Such fund shall consist of an amount charged Dealer by Seller for each vehicle sold to Dealer and a like amount contributed by Seller. The amount charged to Dealer and contributed by Seller shall be established by Seller, and may be changed from time to time. Such fund shall be used for advertising or promoting Datsun products in the area wherein Dealer maintains its place of business, by advertisements placed by Seller and/or Dealer and/or, where such groups exist, by or on behalf of dealer's cooperative advertising groups. All payments from such fund shall be for expenditures for advertising or promotions approved by Seller and shall be made only upon receipt by Seller of proof of the expenditure. Dealer shall have no rights with regard to monies in such fund, except the right to have them expended in accordance herewith. (Emphasis added.) (Plaintiff Exhibit No. 3025.)
 
 
 25
 The evidence showed that in actual execution this contract operated in the following manner. When the dealer bought a new car from Nissan-USA, he was charged from $25 to $60 as part of the price for the car and this sum went into the co-operative advertising fund, over which Nissan-USA maintained complete unilateral control as to reimbursements for dealer advertising placed in accordance with Nissan criteria. Periodically, "advertising standards" were mailed to the dealers outlining the required criteria. A typical example of such a mailing (September 1, 1970) is appended to this opinion.
 
 
 26
 To be reimbursable under the co-operative advertising plan it was prescribed that the local dealer advertisement should (1) advertise new Datsuns, (2) name the manufacturer's recommended retail price or no price at all, and (3) could not state or imply that one dealer was in a better position to sell a new vehicle than any other dealer. If the dealer complied with the prescribed standards he was reimbursed to the extent of his contributions, plus a matching amount from Nissan-USA.
 
 
 27
 There was evidence, however, that regardless of the requirements for participation in the advertising fund dealers actually sold the vehicles at whatever price they chose. Moreover, they were free to advertise new cars at whatever price they wished so long as done at their expense, without refund and matching money from Nissan-USA. On his own volition, at his individual expense, the local dealer could advertise "sales" and advertise used cars as he saw fit.
 
 The Law
 
 28
 PDQ insisted that there were three basic elements to the allegedly unlawful combination or conspiracy: (1) the co-operative advertising program, (2) the system of district managers which forced the local dealers into selling new cars at higher prices, and (3) a third ground which has since been rejected by the Supreme Court. We think Contention No. 2 evaporated with the jury verdict and that only Contention No. 1 remains for resolution, the outcome depending on whether No. 1 was a per se violation of the applicable law.
 
 
 29
 PDQ says that a per se violation was established under teachings of United States v. Serta Associates, Inc., 296 F.Supp. 1121 (N.D.Ill., 1968), affirmed in, 393 U.S. 534, 89 S.Ct. 870, 21 L.Ed.2d 753 (1969), and United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967).
 
 
 30
 Sealy arrived at the Supreme Court before Serta. Sealy "was engaged in a continuing conspiracy with its manufacturer-licensees to agree upon and fix minimum retail prices on Sealy products and to police the prices so fixed", 388 U.S. at 351, 87 S.Ct. at 1849. Since 1925, and continuously thereafter, "the prices to be charged by retailers . . . have been fixed", 388 U.S. at 355, 87 S.Ct. at 1851. The anticompetitive nature and effect of the activities were so apparent and so serious that "the courts (would) not pause to assess them in light of the rule of reason", 388 U.S. at 355, 87 S.Ct. at 1851.
 
 
 31
 It is to be noted, however, that Sealy was a "horizontal agreement " case, i. e., one in which the participants "in the normal course of things would be competing among themselves", 388 U.S. at 352, 359, 87 S.Ct. at 1853. On the other hand, "vertical restraints" are those limitations imposed by a manufacturer on his own dealers, or by a licensor on his licensees, which may have independent and valid business justifications (dissenting opinion of Mr. Justice Harlan, 388 U.S. at 359, 87 S.Ct. 1847).
 
 
 32
 Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 58, 59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) was a private antitrust action concerned with vertically imposed restraints on locations for franchised local retailers. Expressly overruling a prior decision, the Supreme Court did not foreclose the possibility that particular applications of vertical restrictions might justify per se prohibition but it did "make clear that departure from the rule of reason standard (in vertical restraint cases) must be based upon demonstrable economic effect", 97 S.Ct. at 2562. The Court returned to the rule of reason that had governed vertical restrictions prior to United States v. Arnold, Schwinn & Company, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), saying that "(w)hen competitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason . . . .", 97 S.Ct. at 2562, 2563.
 
 
 33
 We now return to United States v. Serta Associates, Inc., supra, "a contemporary companion case to Sealy ". Sealy and Serta presented "virtually the same facts" and both were "essentially horizontal combinations", 296 F.Supp. at 1122. Indeed, the decision at the trial level in Serta had been deferred pending the decision of the Supreme Court in Sealy.
 
 
 34
 Keeping our eyes on the fact that Serta was a matter of horizontal restrictions, Serta's co-operative advertising plan was described as follows:
 
 
 35
 In addition, Serta and its licensees influenced the retailers' advertised prices by offering cooperative advertising programs, whereby advertising mats, sales material, and a portion of the cost were supplied by Serta; however, a dealer was not allowed to participate in the program unless all of his advertisements contained Serta's suggested retail prices. When combined with the surveillance of all advertising, this practice hampered dealers who wanted to sell below the advertised price because they had only three options; they could advertise Serta standard items at the prices contained in the specifications, advertise without using a price, or refrain from any advertising.
 
 
 36
 296 F.Supp. at 1125.
 
 
 37
 Citing United States v. Socony-Vacuum Oil Company, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), and United States v. Trenton Potteries Company, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), the District Court held that "interference with local advertising violates the strict per se prohibition of all tampering with price" and that "all attempts to influence the locally advertised prices of the dealers are illegal, including price restrictions in Serta's cooperative payment program", 296 F.Supp. at 1126.
 
 
 38
 Since it had already decided Sealy, the Supreme Court affirmed Serta on motion of the government, without written opinion.
 
 
 39
 The quoted language from the District Court opinion in Serta is "strong stuff" and at first blush would appear indisputably to support PDQ's contention that Nissan's cooperative advertising plan was a per se violation of the antitrust laws. Upon analysis, however, we are of the view that Serta had decisive distinguishing characteristics.
 
 
 40
 1. The Serta and Sealy defendants, acting horizontally instead of vertically, had so apparently and so seriously fixed the prices to be charged by retailers, of such an anti-competitive nature and effect, that the Court would not pause to assess them in the light of reason.
 
 
 41
 2. The co-operative advertising program was one of the methods designed to implement the illegal agreement.
 
 
 42
 3. Here, in a vertical restraint case, the jury found that no nationwide combination or agreement existed. This finding had such sufficient evidentiary support that appellant now declines to attack it. The evidence shows that the Datsun dealers were free to sell cars, and did sell them, at their prices.
 
 
 43
 Looking at the provisions of the co-operative advertising plan, imposed by the manufacturer upon all of its franchisees, we cannot say as a matter of law that the plan, in the absence of an agreement to fix prices, was on its face of such an anticompetitive nature and effect that it negated the rule generally applied in the appraisal of vertical restraint cases.
 
 
 44
 In the franchise agreement, Nissan-USA agreed to promote Datsun automobiles nationally. The franchise dealers bound themselves to promote the automobiles locally. There could be sound business reasons for specific advertising requirements, especially where Nissan not only returned the franchisee's advertising investment but matched it with its own funds.
 
 
 45
 Neither can we perceive anything unreasonable per se about anchoring advertised prices to the manufacturer's suggested retail price. After all, there is nothing unreasonable per se about a manufacturer's suggested retail price.
 
 
 46
 By federal statute, the manufacturer is not only authorized, but required, to affix a suggested retail price sticker to each new car which is to be sold in the retail market, 15 U.S.C., § 1231, et seq. (The Monroney Act). Indeed, it is a misdemeanor to withhold, alter or remove such a sticker, 15 U.S.C., § 1233. PDQ suggests that the only function of a suggested retail price is to provide the basis for bargaining, but we fail to see how the same could not be said of an advertisement which states that same suggested window sticker price.
 
 
 47
 Neither are we able to say as a matter of law that it is illegal per se to require a local car dealer to contribute to the cost of advertising the product which he intends to sell at a profit after he obtains it from the manufacturer who is vitally interested in the continued prestige, acceptability, and marketability of that product.
 
 
 48
 We would have a different per se case if the manufacturer had fixed a price which the retailer had to follow in actual sales and if the retailer were compelled to contribute to the advertisement of such a fixed price.
 
 
 49
 Since this is not that kind of case, we hold that the Nissan co-operative advertising program was not a per se violation of the Sherman Act and was due to be appraised under the rule of reason.
 
 
 50
 We are not persuaded by the idea that the advertising plan here at issue was "price tampering" within the meaning of Socony-Vacuum, supra, or Trenton Potteries, supra. Those cases dealt with agreements specifically designed to raise, lower, or stabilize prices in a manner which interfered with the free play of market forces. In our case the jury found that no such combination or agreement had ever existed.
 
 Conclusion
 
 51
 This antitrust case, in all its disputed facets, was of a kind particularly suited to the disposition of a jury upon competent evidence after being properly instructed.[3] We do not prolong a lengthy opinion to detail, point by point, the complaints of PDQ about evidentiary rulings and jury instructions. Those complaints did have our incisive consideration and are found to be without reversible merit.
 
 
 52
 The judgment of the District Court on the issue of liability is
 
 
 53
 AFFIRMED.
 
 Award of Costs
 
 54
 After entry of final judgment by the trial court, the defendants filed a Bill of Costs totalling $42,452.16. Upon reviewing the Bill and after a full briefing, the Court entered an Order Reviewing Bill of Costs in which it awarded the defendants costs totalling $34,272.80. These costs were comprised of $16,920 for trial transcripts, $15,739.80 for deposition costs, $1,608.60 for witness fees, and $4.40 for Marshall fees. In this appeal No. 77-2572, PDQ urges that the taxing of costs was improper.
 
 
 55
 Rule 54(d) of the Federal Rules of Civil Procedure states that costs shall be allowed as a matter of course to the prevailing party except when a statutory provision is to the contrary. This rule permits the district court to exercise its discretion in awarding costs and, therefore, makes our review very narrow. See LeLaurin v. Frost National Bank, 5 Cir.,391 F.2d 687, 692, cert. denied, 393 U.S. 979, 89 S.Ct. 447, 21 L.Ed.2d 440 (1968). Only when a clear abuse of discretion is shown can an award of cost be overturned. Kinnear-Weed Corp. v. Humble Oil and Refining Co., 5 Cir., 441 F.2d 631, 637, cert. denied, 404 U.S. 941, 92 S.Ct. 285, 30 L.Ed.2d 255 (1971). This rule applies in this antitrust action in which the plaintiff was unsuccessful in proving his claim. See Lewis v. Pennington, 6 Cir., 400 F.2d 806, 819, cert. denied, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968). The defendants were entitled to recover their lawful costs.
 
 
 56
 As an individual portion of the costs, the trial court awarded costs for an expedited "daily" transcript requested solely by the defendants and to which the plaintiffs had not agreed. This additional expense was for the convenience of the defendants and was, by no means, indispensable. Therefore, this award was an abuse of discretion. See Farmer v. Arabian American Oil Co., 379 U.S. 227, 233-34, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964); United States v. Lynd, 5 Cir. 1964, 334 F.2d 13; Hiller v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 60 F.R.D. 87, 89 (N.D.Ga.1973). Upon remand the award for the cost of the daily transcripts must be deleted.
 
 
 57
 The award of mileage costs for defense witnesses was properly within the trial court's discretion. Farmer v. Arabian American Oil Co.,supra. There was also no abuse of discretion in awarding the cost of those depositions used at trial and not previously used in other litigation. Harrington v. Texaco, Inc., 5 Cir. 1964, 339 F.2d 814, 822, cert. denied,381 U.S. 915, 85 S.Ct. 1538, 14 L.Ed.2d 435 (1965).
 
 
 58
 Except for the daily transcripts, the award of costs is affirmed. The case is remanded for modification of the order awarding costs.
 
 
 59
 No. 77-1658 AFFIRMED.
 
 
 60
 No. 77-2572 AFFIRMED, as modified, and REMANDED.
 
 APPENDIX
 
 61
 Letter sent to all Datsun dealers on September 1, 1970.
 
 
 62
 "We have been asked by many dealers for a statement of our policies in judging advertising submitted for co-op reimbursement. We do not like to refuse reimbursement and we are positive that dealers don't like it either. With growing interest in retail advertising by state and federal agencies, we feel that all Datsun dealers will benefit from uniform advertising standards.
 
 
 63
 "Generally, we recommend that all Datsun dealers follow the standards of practice in the booklet prepared by the National Automobile Dealer's Association and the Better Business Bureau. We urge you to keep this booklet with your Datsun advertising file and refer to it from time to time.
 
 
 64
 "Along with the general industry standards of advertising practice, following are points we check before a Datsun ad is approved for co-op reimbursement.
 
 
 65
 1. All advertising should be exclusively Datsun. No co-op will be paid on ads combining Datsun with other makes.
 
 
 66
 2. All Datsun advertising should be exclusively on new cars.3. If price is used, it must be not lower than Datsun suggested retail price, plus any additional costs (D & H, freight, etc.) required by local or state regulations.
 
 
 67
 4. If price and car are used together, the price must be for the car featured. For example, do not use an illustration of a 240-Z with price saying "Datsun prices start at $1,916.00".
 
 
 68
 5. If monthly payments are included in an ad, specify down payment, monthly payments, length of contract, and all other information required by the federal "truth in lending" law.
 
 
 69
 6. Any guarantee other than regular Datsun warranty should be clearly identified.
 
 
 70
 7. All ads including information about financing should state qualification requirements, for example, "51/2% bank financing . . . (to qualified purchaser or with approved credit)".
 
 
 71
 8. We will not approve co-op for any Datsun "sale" ads which infer that dealer is selling for less than suggested prices.
 
 
 72
 9. No co-op will be paid for ads which include copy about "overstocked, huge inventory, volume dealer" or any such copy that might infer that one dealer is in a better position to make a good deal than another.
 
 
 73
 10. No co-op will be paid for any ads offering "free" or "bonus" items with purchase of a new Datsun which, in effect, discounts the price of the unit.
 
 
 74
 "If you have any questions about co-op advertising reimbursement, please check with your district or regional manager. The time to check is before the ad is written."
 
 
 
 [1]
 15 U.S.C. § 1 provides in part:
 Every contract, combination, in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations is declared to be illegal. . . .
 
 
 [2]
 15 U.S.C. § 15 reads as follows:
 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
 
 
 [3]
 The District Court instructed the jury, in depth, with what appears to have been great care. Obviously, we cannot quote all of the instructions in this opinion. For clarity, however, we do quote the following (appearing at Pages 124-128 of the printed Appendix)
 "A price-fixing conspiracy may constitute any mutual agreement or arrangement or understanding between two or more persons to sell at a uniform price or to raise or lower or to stabilize prices. Thus, a common plan or understanding knowingly made or arranged or entered into between two or more sellers engaged in interstate trade or commerce who adopt or follow or adhere to any pricing formula which will result in raising or lowering or maintaining at fixed levels prices charged for goods or services sold in interstate trade or commerce would constitute a price-fixing conspiracy in violation of the federal anti-trust laws.
 "A contract, combination, or conspiracy which has the effect of fixing, maintaining or stabilizing resale prices constitutes a violation of the antitrust laws and is an unreasonable restraint of interstate or foreign commerce as a matter of law. Whether the prices agreed to be fixed, maintained or stabilized, are reasonable or unreasonable is not material.
 "Therefore, if you find that there was a contract, combination or conspiracy which had the effect of fixing, maintaining, or stabilizing resale prices then you must find that the participants in the contract, combination, or conspiracy violated the law.
 "You are instructed that defendant Nissan-USA had the right to enter into various agreements with its franchised Datsun dealers. It is, of course, common for one business enterprise to enter into many oral and written agreements with another business enterprise during the regular and ordinary conduct of its business. Not all agreements violate the antitrust law. The only type of agreement with which you are to be concerned is the agreements alleged by plaintiffs to be unlawful under the antitrust laws that is, anticompetitive agreements between defendants and all Datsun dealers to sell and advertise only at fixed prices, to establish exclusive territories, and to refrain from selling Datsuns to particular classes of customers."