[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This matter is before the Court for decision after hearing on the merits followed by extensive briefing by the parties. At the inception of trial one of Plaintiffs'[1] counsel underscored his belief that: "[t]his case shall set a standard for decency for nonprofits in Rhode Island"
Before addressing issues of law, or equity, or indeed of decency, this Court will set forth the salient facts forming the basis for the controversy which, unfortunately for all, consumed the energies and time of what the Court believes to be well-intentioned litigants on both sides of the defining issue as among the Athenaeum membership (however denominated). "Should the Audubon's Birds of America Folio be sold and the proceeds added to the Athenaeum's endowment?"
 Background
The record before the Court discloses that Defendant, the Providence Athenaeum, (hereinafter Athenaeum) traces its origin back to 1753. The existing legal entity was chartered as a corporation with: "All the privileges and powers incident to corporations instituted for literary and scientific purposes."[2]
So far as appears of record before this Court, the corporate affairs of the Athenaeum continued uneventfully from the date of its incorporation for 138 years to April of 1974.
Shortly before the last mentioned date, the Athenaeum sought and was accorded recognition by the Internal Revenue Service as a 501(c)(3) exempt organization.[3]
In order to comply with the statutory requirements for designation as such an exempt organization, a special shareholders meeting of the Athenaeum was noticed out and held, which resulted in an amendment to the Articles of Incorporation[4] being approved and filed with the Office of the Secretary of State. The Amendment, consistent with the provisions of the Internal Revenue code, limited what officers, directors, shareholders and other private persons may receive from the net earnings of the Athenaeum and further mandated that upon its dissolution, the net assets of the entity would be devoted to exempt organization-type purposes.[5]
Following the adoption of the 1974 Amendments, from time-to-time, the bylaws were revised. The 1985 bylaws[6]
for example, in Article III, Section 4, provide for 4 separate and distinct categories of membership including Shareholder, which by definition includes ". . . members waiting for a share."[7]
By 1997, the word "Shareholder" had disappeared from the bylaws and essentially had (at least there) been replaced with the word "Member." The Court notes that Section 7-6-2 of our General Laws, the definitional section of the Rhode Island Nonprofit Corporation Act in Subsection 8, defines "Member" as "one having membership rights in a corporation in accordance with the provisions of its Articles of Incorporation or bylaws regardlessof the name by which the person is designated." (Emphasis added).
The foregoing facts set forth the basis for Plaintiffs' contention that they (together with all other shareholders who derive their shares from original owners) possess exclusive voting rights including exclusive voting rights with respect to the sale of all or substantially all of the Athenaeum's assets.
Of further consequence in this case is the fact that in 1832, the Athenaeum caused a group to subscribe to the Double ElephantFolio of the Birds of America by John James Audubon (hereinafter variously referred to as "the Folio," the "Double Elephant Folio" or the "Birds of America.") Several years thereafter, the Folio and subscription thereto apparently were transferred to the Athenaeum in consideration of the issuance by the Athenaeum of additional shares of its stock and the Athenaeum's agreement to be responsible for the unpaid balance of the subscription. From then to now, the Athenaeum has owned one set of the Double Elephant Folio, which in recent years until the signing of the contract with Defendant, Christie's Inc., hereinafter referred to, was housed in the rare books room at the Athenaeum facility on Benefit Street in the City of Providence. While most of the Folio reposed in special drawers with some security, some plates forming a portion of the Folio, in fact, were on display at the Athenaeum where they could be and were viewed not only by Members but also by legions of students, children and other interested parties. In the mid-1990's over $100,000 was raised in order to perform restoration work on the Folio, which contains paintings by Audubon of nearly every bird in the United States and in its territories.[8]
From time-to-time, various parties involved with the Athenaeum had given thought to selling the Folio, but until sometime in 2002, as hereinafter will be more fully detailed, there was no vote authorizing such action so far as is reflected in the record before the Court.[9] A new Library Director, Jonathan Bengston, was hired in 2001. During the interviewing process, he was asked his thoughts with respect to the sale of the Folio. He indicated that he was not in favor of a sale but that it might be considered "as a last resort." With the passage of time the Board of Directors of the Athenaeum faced with mounting expenses and reduced income, resulting in ever-increasing financial shortfalls, explored the possibility of converting the Folio to more liquid assets.
The individual named Defendants in this matter are the officers and directors of the Athenaeum. Finally, Christie's, Inc., reputedly one of the leading auction houses in the world, also is a party Defendant. Christie's and the Athenaeum signed a so-called consignment agreement on February 24, 2003, which provided that Christie's in accordance with the terms and conditions set forth in that contract, would attempt to sell the Double Elephant Folio at auction for the Athenaeum.[10]
 Plaintiffs' contentions
Plaintiffs, in addition to the contentions made by them with respect to their sole voting rights further assert as follows:
 1. The proposed sale by the Athenaeum was unauthorized, thus would be illegal and would be fraudulent.
 2. The consignment contract with Christie's should be voided and any enforcement of such contract should be enjoined.
 3. Any and all claims of Christie's for relief of any nature should be denied.
Essentially, Plaintiffs contend that the evidence herein demonstrates that an illegally constituted Board, acting pursuant to illegally adopted bylaws, abdicated their fiduciary responsibility and wrongfully delegated to their employee (agent), the Library Director, authority to deal with Christie's. Alternatively, Plaintiffs assert that the evidence shows that the Library Director, acting without authority, undertook to deal with Christie's and its agents. Plaintiffs contend that the Library Director was "played" by Christie's Rhode Island representative into divulging confidential information with respect to the Athenaeum's financial condition.[11]
Further, Plaintiffs tell us that other sensitive information with respect to the manner of sale and the selection of a sales agent or auctioneer to conduct the sale wrongfully was obtained from the Library Director by Christie's representative and conveyed by her to her supervisors. Plaintiffs argue that Christie's knowing such information was wrongfully obtained, utilized it in structuring its contract proposal to the Athenaeum. Plaintiffs assert that with little more than a cursory review of the terms of the proposal, and none of the contract itself; with almost no discussion or review of the concept of sale; and without the benefit of sophisticated legal review of the contract, the Board authorized the execution of the agreement, which several days later surreptitiously was signed by the Board's President and the Library Director on behalf of the Athenaeum. Plaintiffs contend that neither the President nor the Library Director realized that a new 5-year exclusive in favor of Christie's had been added to the contract terms without discussion.[12] Thereafter, Christie's took possession of the Folio which presently is held by it subject to an Order of this Court precluding Christie's from selling or otherwise disposing of it. Plaintiffs further contend that at the advice and with the prodding of Christie's, so as to preclude legal action, little or no information was timely imparted by the Board to the general membership of the Athenaeum with respect to the Board's vote to sell the Folio.
Having set out the primary contentions of the Plaintiffs, this Court now will summarize the contentions of first, the Athenaeum Defendants that is to say the non-Christie's Defendants and finally the contentions of Christie's.
Following the Court's statement of the Defendants' contentions, this Court will make specific findings of fact based on the evidence before it and then will apply to the facts the law as it finds it to be in order to reach its decision.
 Defendant's Contentions
The Athenaeum Defendants essentially defend by telling the Court that Plaintiffs presented no evidence which would support a decision in the Plaintiffs' favor, i.e. Plaintiffs failed to prove their case. Further, these Defendants assert that the actions of the Directors complained of are protected under the Business Judgment Rule, are consistent with the bylaws of the Athenauem and that those bylaws are legal and binding and in any event Plaintiffs had ratified the bylaws or were estopped from attacking the bylaws because of their failure to contest them over at least a 5-year span.
Finally, the Athenaeum raises the prospect that because of Plaintiffs' acquiescence over the past 5 years without complaint the doctrine of Laches should preclude any relief to Plaintiffs at this juncture.
Defendant, Christie's, similarly to the position of the Athenaeum Defendants, asserts that Plaintiffs produced no evidence to support their claims as against either the Athenaeum Defendants or as against Christie's. Christie's further reminds the Court that it, under the provisions of the consignment contract was not buying the Double Elephant Folio but only was undertaking as one of the leading auction houses in the world, to market and sell the Folio for the highest obtainable price at an open public auction. Finally, Christie's denies that any information imparted to it by the Library Director either was wrongfully communicated to it or fell within the definition of a trade secret as contemplated by the Uniform Trade Secrets Act. (In rebuttal, Plaintiffs assert they have not alleged a violation of the Rhode Island Trade Secrets Act).
 Facts
Turning now from contentions to facts (in addition to the facts hereinbefore set forth). The Athenaeum is one of Providence's oldest and more venerable institutions. It is a private library created and incorporated by act of the 1836 Rhode Island General Assembly — although its roots extend back into the prior century. The Athenaeum over the term of its existence has been the recipient of gifts, bequests and otherwise has accumulated an endowment which at the height of the high stock market returns in the 1990s exceeded $6,000,000. At least by the 90's new leadership had become involved in directing the affairs of the Athenaeum. Basically, that new leadership is the individual Athenaeum Defendants, the members of its Board of Directors. With new leadership came some new ideas, things such as a.) formal audits first undertaken for year end 12/31/98,[13] b.) a master plan was adopted, c.) the hiring of a development professional (a fund raiser) and d.) a formalized spending policy was adopted. Also, with new leadership and faced with a declining stock market came a concern for the economic viability of the institution. It is undisputed that until the mid to later part of the 90's, the annual operation of the Athenaeum had required only the utilization of operating income, grants, and gifts together with interest and dividends attributable to the endowment. Effective January, 1998, the Athenaeum adopted a spending policy, the so-called Statement of Endowment Fund Investment Policy[14] which contained a spending policy as follows:
 "The spending policy is designed to limit spending for current operations to the expected long term, real (inflation adjusted) rate of return from the endowment. This is expected to average 5% per year. Therefore, the distributions from endowment are expected to be contained within a range of 4% to 6% of a rolling three year average of year-end market values. . . .
 The Board of Directors, or the Executive Committee of the Board of Directors may revise this spending policy based on its evaluation of the expected real rate of endowment return and/or the operating need of the Providence Athenaeum." From 1998-2002, despite some reductions instituted during the budgeting process, the annual budget increased from about $450,000 to slightly in excess of $900,000. In order to balance the budget the percentage drawn from the endowment ran from 5.97% in 1998 to a high of 9.79% in 2002. In each of the years 1998-2003, it was in excess of the spending policy average of 5% and indeed in each of those 6 years in excess of the expected range of 4-6% (save only 1998 when as indicated it was 5.97%). To the extent that withdrawals exceeded the earnings of the endowment that represented an invasion of the principal of the endowment.
That invasion, coupled with the stock market decline resulted in a substantial reduction in the value of the endowment which by late July 2002 had fallen in value to slightly more than $3,950,000 and fostered in the leadership a heightened concern for the future of the Athenaeum. Compounding these concerns was the need for substantial repairs to the Athenaeum's physical structure located on Benefit Street across the street from this very courthouse. Sagging floors had made part of the building unsafe and required substantial expenditures to jack the floor up under the reading room. Beset by these concerns, the Board of Directors in the fall of 2002 conducted a series of meetings to discuss and address the problems.
In September of 2002, the Board conducted, what was termed in testimony, a retreat where various alternatives or options were discussed with respect to the continued viability of the institution. Those alternatives included without limitation raising membership dues, cutting services, cutting staff positions, a capitol campaign, merging with another institution, sale of the building and sale of the Birds of America. Additional monthly meetings were held addressing the same general topic. A review of the impact of various proposed cuts so as to permit compliance with the spending policy caused the Board at its December meeting to determine that the proposed cuts would fundamentally and in their view adversely change the basic nature of the institution.
At that meeting the Board voted to sell the Folio, which recently had been valued by a Christie's appraiser at $5-7 Million, unless by April 30, 2003, the endowment had been raised to $10 million.
Several months prior to the vote, Bengston, the Library Director, had been directed to (i) obtain an updated Christie's appraisal of the value of The Birds of America (ii) talk with potential donors to determine the feasibility of a campaign and (iii) undertake such other investigations as might be appropriate to assist the Board in properly determining a future course of action. In that connection, Bengston had a number of discussions with Mrs. Ray, Christie's Rhode Island representative.
For a protracted period of time reaching back more than 10 years, Christie's had maintained as part of its general business (business development) efforts a relationship with the Athenaeum. Its Rhode Island representative was a member of the Athenaeum. Christie's from time-to-time had performed gratis appraisals of various assets of the Athenaeum including in 1991 a $1.5 million dollar appraisal of the Birds of America Folio.[15]
Further, Christie's had had some involvement by way of a proposal to sell in connection with the year 2000 discussions which resulted in the Board voting not to sell the Audubon Folio. (See footnote 9 supra)
Bengston sometime after the Board's December meeting and vote contacted Mrs. Ray and arranged for a lunch meeting in Providence with the President of the Athenaeum Board and himself and a number of Christie's representatives in late January 2003. At that time, the Board already had voted to sell the folio if the endowment wasn't increased by April 30, 2003, as aforesaid. Following that lunch meeting and after discussion among the President of the Athenaeum Board and its Executive Committee, Christie's was invited to make a presentation to the Board immediately prior to its February 19, 2003 meeting. During the Board meeting on the 19th following that presentation, the Board was satisfied that Christie's proposal was appropriate (although one Board Member suggested seeking a proposal from another auction house) and based on its reputation as well as on its past success in selling a Double Elephant Audubon Folio for the highest known price ever obtained for such a Folio, Christie's was selected by the Board and the Board unanimously authorized the signing of a contract with Christie's. At this same meeting the Board also discussed a letter to be sent to the membership advising of the Board's decision. A draft letter was prepared by Bengston and was sent by him to Christie's so that its Public Relations Department might make appropriate suggestions. This letter and the timing of its mailing to the membership was subject to discussion between Bengston and Christie's and among the Directors of the Athenaeum. Ultimately, the letter was sent only after having been presented to the Board which made a number of modifications. One of the reasons that Christie's comments on the letter were solicited was that its public relations expertise was well known and it had assisted other institutions with de-accessing works of art.[16]
The day following the February 19th Board meeting, a copy of its proposed contract was sent by Bengston to Mrs. Kennedy, a Board member who was a partner at a large Providence-based law firm for her "informal" review. Certain suggestions made by her ultimately were incorporated into the consignment contract before it was executed.
Christie's is a business (that is to say a for profit organization). There can be no question in examining the various e-mails[17] exchanged among Christie's representatives that Christie's was pursuing its business interests in attempting (successfully) to obtain the consignment to sell the Audubon Folio at a public auction sale. In connection with its business development efforts, Christie's had maintained a relationship with the Athenaeum over an extended period, during which it had performed gratis appraisals of Athenaeum-owned assets including the very Folio here at issue. Christie's in the proposal here at issue had agreed to pick up the insurance costs when it took possession of the Folio, presented an extensive marketing plan, agreed to pay all expenses incident to the sale,[18] agreed not to charge a seller's commission and agreed to a provision in the consignment agreement which under certain (possible but highly unlikely) circumstances would have permitted the Athenaeum, without cost, to withdraw the Folio from sale.[19]
Finally, on or about February 24, 2003, a 3-page communique signed jointly by the President of the Athenaeum and by its Executive Director (Library Director) was sent to the Members of the Athenaeum. This communique was "Regarding the Providence Athenaeum's Finances and the Sale of the Audubon Folio."[20] On March 2, 2003, as theretofore noticed, the annual Members' meeting took place. At the meeting, a minority of those present was vocal in their opposition to the auction sale contemplated by the consignment contract; however, a resolution approving of the sale was passed.
Thereafter, a petition circulated and was presented to the Board seeking certain specific information and materials and further requesting a Special Meeting to discuss the sale. The Board of Directors engaged counsel, made the requested materials available and scheduled and held an informational meeting at which no votes were permitted or taken.
Such other facts as may be necessary to this Decision will be set forth in the discussion of legal issues which follow.
 Discussion
Plaintiffs here make a multi-faceted attack upon the actions of the Board of Directors with respect to the Double Elephant Folio. First, Plaintiffs assert that the Articles of Incorporation vest exclusive voting rights in the Shareholders. The Court finds that Plaintiffs overlook the provisions of 7-6-2(8) of our General Laws quoted on page 3, supra. That provision contemplates that the members may be called by various names ("however denominated") including Shareholders. No evidence was produced or offered by Plaintiffs with respect to any vote taken by the shareholders, the members or any other body with respect to any amendments to the Articles or to the adoption of any bylaw or bylaws. There is no evidence before the Court suggesting the impropriety of any bylaw provision as it formerly or now is found to exist. Clearly, Plaintiffs here had the burden of proof upon that issue. Argument alone does not suffice. The Court finds that there is a well-recognized presumption;
 ". . . that a corporation exercises its powers according to law, that its bylaws are valid and that "the burden of overthrowing them is upon the party who asserts their invalidity"." Superior Bedding Co. v. Serta Assoc., Inc., 353 F. Supp. 1143 at 1149 (USDC N.Dist. Ill.).
The same principal has been articulated by the highest court of one of our sister states to which the Rhode Island courts oft times turn for guidance on questions of corporate law.
 "The bylaws of a corporation are presumed to be valid and the Courts will construe the bylaws in a manner consistent with the law rather than strike down the bylaws." Frantz Manufacturing Co. et al. v. EAC Industries, 501 A.2d 401 (Del. 1985)
This Court further finds that the original act of incorporation in 1836 in Section 1, authorized the adoption of bylaws. The bylaws in their various iterations include the bylaw provision in effect at the time of the vote to sell the Folio as aforesaid and in effect at the time of the authorization for the consignment contract with Christie's which vested in the Directors the power to
 ". . . direct all actions with respect to assets and liabilities of the Athenaeum including . . . disposal of assets . . . and all other actions that may lawfully be taken by the Athenaeum. The Board of Directors shall transact, manage and regulate all of the affairs of the Athenaeum of every kind not otherwise provided for. . . ."[21]
This Court having found total failure of proof with respect to any attack on the validity of the bylaws, concludes that it was within the power of the Board of Directors A.) In December 2002 to vote to sell the Folio and B.) In February 2003 in furtherance of the December vote to authorize the consignment contract with Christie's.
Having determined that the Board possessed the power, the Court now turns to an examination of whether it was proper under all the attendent circumstances for the Board to exercise that power. In that connection, the Court notes that Plaintiffs fault the Board for the following reasons:
Plaintiffs assert that the individually-named Defendants in their capacity as members of the Board of Directors are in breach of their fiduciary duty and that the votes of the Board first to sell the Folio and then to authorize the consignment contract with Christie's were beyond the Board's power. This Court above has held that the Plaintiffs' failed to carry their burden of showing that the power was retained by the Members or Shareholders. Whether the Board acted rightfully goes to the issue of whether the Directors and the Board were acting in a manner consistent with their fiduciary duty. Our Non-profit Corporation Act, specifically 7-6-22(b), requires that a director ". . . discharge his or her duties as a director . . . (1) in good faith; (2) with the care an ordinary prudent person in a similar position would exercise under similar circumstances; and (3) in a manner he or she reasonably believes to be in the best interests of the corporation."
When acting in the manner stated in the statute quoted above, the action(s) of the Directors at least in the first instance is/are protected by the Business Judgment Rule. While in this jurisdiction there is little case law with respect to the Business Judgment Rule, the parameters thereof have been articulated by various courts around the country. For example, and again turning to the jurisprudence of Delaware, its Supreme Court has explained the rule thusly:
 "the business judgment rule is a presumption that `in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company [and its shareholders].' The business judgment rule operates as a procedural guide for litigants and as a substantive rule of law. `As a procedural guide, the business judgment presumption is a rule of evidence that places the initial burden of proof on the plaintiff.' To rebut the presumptive applicability of the business judgment rule, a shareholder plaintiff has the burden of proving that the board of directors, in reaching its challenged decision, violated any one of its triad of fiduciary duties: due care, loyalty, or good faith. If a shareholder plaintiff fails to meet this evidentiary burden, the business judgment rule operates to provide substantive protection for the directors and for the decisions that they have made. If the presumption of the business judgment rule is rebutted, however, the burden shifts to the director defendants to prove to the trier of fact that the challenged transaction was `entirely fair' to the shareholder plaintiff." Emerald Partners v. Berlin, 787 A.2d 85, 90-91 (Del. 2001) (citations omitted).
A recent California Court of Appeals decision further explained the Rule in the following language:
 "The business judgment rule is a presumption that directors of a corporation make business decisions on an informed basis, in good faith, and with the honest belief that the course taken was in the best interests of the corporation. Like most rebuttable presumptions, it arises by operation of law. However, the plaintiff may rebut the presumption by presenting evidence that the directors acted fraudulently, illegally, or without becoming sufficiently informed to make an independent business decision. The burden is on the party challenging the decision to present facts rebutting the presumption." State Farm Mutual Auto Insurance Co. v. Superior Court of Los Angeles County, 114 Cal.App. 4th at 450, 2003 Cal.App. LEXIS 1863 at *32-33. (California Ct. of Appeals (2003)
It thus is clear as argued by Defendant Directors that they and their actions are protected under the presumptions which form the Business Judgment Rule unless Plaintiffs overcome such presumptions by demonstrating that any of the triad of fiduciary duties imposed upon the members of the Boards of Directors of the Athenaeum, have been violated.
There was no credible evidence presented to the Court either with respect to the vote to sell or to the vote to authorize Christie's consignment contract that the Directors, or any of them, violated any of their fiduciary duties thus rebutting the procedural and or substantive aspects of the Business Judgment Rule. Put differently, this Court finds Plaintiffs failed to produce evidence sufficient either 1.) to rebut the presumptions created by the Business Judgment Rule or 2.) to place the burden of going forward upon the Defendants. Plaintiffs simply failed to offer even a scintilla of evidence that the Directors, or any of them, acted fraudulently, illegally, or without becoming sufficiently informed so as to make an independent judgment with respect either to the sale of the Folio or the arrangement entered into with Christie's.
Further, Plaintiffs offered no evidence that the terms of Christie's proposal were not in the best interests of the Athenaeum. It may have been that if Plaintiffs had been Directors, they would have decided that a substantial cutback in the services offered, the hours maintained and/or the size of the staff would be better than selling the Folio (although there is no evidence even as to that in the record, Plaintiffs having chosen as was their right, not to testify). That merely would have been evidence that the Plaintiffs' judgment on those issues differs from that of these Directors. That evidence would have been of no consequence and would not have overcome the presumptions implicated by the Business Judgment Rule. That Plaintiffs would have acted differently may at the time of some subsequent election for membership on the Board of Directors form the basis for lively debate. It, however, serves no basis for a court of equity to substitute its judgment for that of the present Board of Directors.[22]
Plaintiffs argue that the Directors' agreement with Christie's was the result of an uninformed decision. They fault the Directors for not soliciting competing bids. They fault the Directors for failing to have appropriate legal counsel review the proposed consignment agreement. This Court has found as a fact that the Board was aware that Christie's had prepared an extensive marketing plan, agreed to pay all expenses incident to the sale, had agreed to pick up the insurance costs of the Folio, had agreed not to charge a seller's commission and had agreed to permit the Athenaeum to withdraw the Folio from sale without cost under certain circumstances.[23]
The Board also was aware of the reputation of Christie's and knew that Christie's had sold a comparable folio at public auction for the highest price ever obtained. Accordingly, there was sufficient information available for the Board to opt not to seek competitive proposals from other auction houses. So far as concerns the failure of the Board to engage counsel to review the proposed contract, it should be noted that Ms. Kennedy, a Board Member and a partner at Edwards and Angel who had some experience with contracts, in fact did make certain suggestions that were incorporated into the consignment contract as signed. Further, the President of the Athenaeum, Ms. Kertzer, an attorney who formerly was law clerk to a United States District Court Judge and an instructor at Stanford Law School, did in fact review the text of the consignment contract and the Court finds she was aware of the 5-year exclusive referred to above, but believed it of no consequence. The Court repeats, the consignment contract simply appointed Christie's as the agent-auctioneer to sell the Folio and was not intended to be a contract of sale to Christie's.
The triad of issues last discussed taken from State FarmMutual Auto Insurance Co. supra, differs, but slightly, from the triad elements found in 7-6-22(b) as set out on page 15supra. Plaintiffs have failed to produce any evidence to overcome this Business Judgment Rule, so called.
While Plaintiffs also have raised issues predicated on "loose accounting and financial control" such as (i) the alleged lack of adherence to the provisions of the Uniformed Management of Institution Funds Act (18-12-1 et seq.); (ii) a failure to determine what funds constituted a restricted endowment fund and what limitations were placed thereon; (iii) the failure of the Board to challenge or question portions of the audit statement prepared by outside accountants or (iv) even to discuss those audit results with the accountants, this Court is satisfied that these problems have existed for a substantial time. Further, the Court is satisfied that the present Board has been addressing these and related issues. The Court finds that while the root cause of the financial difficulties may be with the laize-faire attitude of prior Boards, the failure of Plaintiffs here to produce any evidence that the particular actions, which here are challenged, resulted from a breach of these Directors' fiduciary duty precludes any relief in Plaintiffs' favor. To suggest, as Plaintiffs do, that the Directors have breached a fiduciary duty by offering the Folio (an illiquid asset) for sale where in the judgment of the Board the proceeds of such sale would be the key to the continued economic viability of the Athenaeum, defies both law and logic.
Plaintiffs ask the Court to set aside the consignment contract and to deny any and all claims asserted by Christie's herein due to the inequitable conduct of that Defendant and its agents. This Court has searched the record to find evidence of wrongdoing or other inequitable conduct on the part of Christie's. Nothing has been brought to the attention of the Court upon which it could make a finding that Christie's, in any way, has subverted the proper role of the Athenaeum's Board; or has improperly "played" Mr. Bengston, Mrs. Kertzer or anyone else affiliated with the Athenaeum. There is no evidence that Christie's misused any information imparted to it. There is no evidence that Christie's dominated and controlled any portion of the decision-making process or indeed even of the post decision-making process so as to impose any liability on Christie's or so as to cause its consignment contract to be vitiated.
In view of the discussion above, this Court need not deal with other issues raised by way of defense or indeed with other claims for relief asserted by Plaintiffs except only to say that it was encumbent upon Plaintiffs to prove their assertion that the Folio constitutes a "collection" so as to implicate at this time the Cy Pres Doctrine, this they failed to do.
Finally, this Court feels constrained briefly to discuss the suggestion by Plaintiffs' counsel that "this case shall set a standard for decency for nonprofits in Rhode Island" As counsel well knows, unlike a statement of what the law is or a finding of what the facts are, a determination of what is decent or what decency is, is a metaphysical exercise. Perhaps for some that concept can be quantified by resort to a higher authority. A Supreme Court Justice once wrote to the effect that obscenity is difficult to describe but that he would know it when he saw it. This Court finds that decency is difficult to define.[24]
However, this Court believes it has seen decency in the time and care displayed by the Board members and officers of the Athenaeum who testified in this matter. With respect to the triad above referred to, there can be no question but that the Board members acted 1.) in good faith; 2.) with the care an ordinary prudent person in a similar position would exercise under similar circumstances and 3.) in a manner he or she reasonably believed to be in the best interest of the Athenaeum.
The attorneys for the Defendants may present an appropriate order consistent with this decision which inter alia shall vacate the injunctive relief preventing Christie's from going forward with the proposed auction sale.
[1] The Plaintiff body, shifting at times, appears to be 58 named individuals and one corporate entity, all "shareholders/members."
[2] An Act to incorporate the Athenaeum, in Providence, January, 1836 session of the General Assembly. Exhibit 75.
[3] Income to a 501(c)(3) organization may be exempt from taxes. Gifts and donations to such an organization may be deductible to the donor. 501(c)(3) organizations must be organized for charitable, religious, educational, scientific, literary or like purposes.
[4] 7-6-2 (1) of Rhode Island General Laws, 1956 as amended includes special acts of the general assembly creating corporations as "Articles of Incorporation."
[5] Exhibits 76, 78-79.
[6] Exhibit 55.
[7] At an earlier time, the number of shareholders had been limited to 1,009. This number is contained in the 1985 bylaws. See Article III, Sec 1.
[8] It was John James Audubon's ambition to paint every bird in the United States and its territories, but that ambition was not fully realized. In any event, the Folio generally is deemed to be a significant accomplishment as will be seen infra. There is no question but that the Double Elephant Folio is of significant monetary value.
[9] There was evidence that in 2000 the Board of Directors had declined to offer the Folio for sale.
[10] Exhibit 9.
[11] Plaintiff spent considerable time in an effort to demonstrate that the financial condition was a direct result of misfeasance by the Board of Directors.
[12] See the last sentence of paragraph 10 of Exhibit 9.
[13] Although in Exhibit 85 a letter dated April 30, 2002 from the Athenaeum's current auditors there is reference to a 1990 audit on page 000077.
[14] Exhibit 53.
[15] See reference in final paragraph on page 1 of Exhibit 28. Exhibit 28 is the December 2002 appraisal by Christie's.
[16] Apparently a term of art for selling or disposing of works of art.
[17] See, for example, Exhibits 23, 24 (". . . continue this good relationship if we are to ever get them (the Folio)" 29 and 30 ("we're getting a lot closer . . .")
[18] Such as insurance, packing, shipping and custom duties.
[19] See paragraph 10 of Exhibit 9.
[20] Exhibit 46 is a copy of this communique.
[21] See current bylaws Exhibit 22, Article VI, Section 7.
[22] This statement is not intended to suggest that if the court were voting as a Director, its judgment would have been the same as that expressed by the Directors or that militated for by the Plaintiffs.
[23] See Page 12 Supra.
[24] Although the American Heritage Dictionary, 4thEdition defines decency thusly:
 "(1) State or quality of being decent, propriety.
 (2) Conformity to prevailing standards of propriety . . .
 (3A) Social or moral proprieties. . . ."